COMMONWEALTH *vs.* FREDERICK BEARSE.

Plymouth. November 2, 1970. — December 30, 1970.

Present: TAURO, C.J., SPALDING, KIRK, REARDON, & QUIRICO, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial.

Upon review of a capital case under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, in which the defendant was convicted of murder in the second degree of his sixteen year old son by shooting with a rifle when they were alone in the downstairs rooms of the family dwelling, this court decided that justice required that the verdict be set aside and the case stand for trial on so much of the indictment as charged involuntary manslaughter where it appeared that the prosecutor in his opening claimed he would prove that on the evening of the shooting the defendant said to his wife "I'm going to kill that kid," but proof of such statement was never forthcoming, that the prosecutor in the opening also unwarrantably attributed to a statement alleged to have been made by the victim a meaning highly prejudicial to the defendant, that contrary to the import of testimony of the defendant's wife there was no reason to conclude that he habitually overindulged in alcohol, that the defendant testified that the shooting was an accident and that his intention was to give the rifle to his son to clean so it could be sold, and that in his closing argument the prosecutor excoriated the defendant without warrant and repeatedly asserted that the killing was by "design."

INDICTMENT found and returned in the Superior Court on May 7, 1969.

The case was tried before *Taveira,* J.

*Alton F. Lyon* for the defendant.

*Dennis L. Collari,* Assistant District Attorney, for the Commonwealth.

KIRK, J. The defendant was indicted for murder in the first degree, pleaded not guilty, was found guilty of murder in the second degree, and was sentenced to the Massachusetts Correctional Institution at Walpole for life. The trial was held subject to G. L. c. 278, §§ 33A–33G. The case is before us on a transcript of the evidence, a summary of the record and the defendant's assignments of error.

Certain facts are not disputed. On the evening of April 1, 1969, Frederick Bearse, Jr. familiarly known as Ricky, aged

sixteen, the younger son of the defendant, was fatally shot through the heart by a bullet from an 8 mm. German Mauser rifle. Admittedly, the rifle was in the hands of the defendant when the fatal shot was discharged. The shooting took place in the family dwelling on Pierce Street, Rochester, where the defendant lived with his wife, their older son, Michael, age twenty-two, and Ricky. The couple also had two married daughters who lived elsewhere. Ricky attended the regional high school and did odd jobs for neighbors and others in his spare time for spending money. Michael was regularly employed and contributed $10 a week for his support. Michael had served two years in the army, including a tour in Vietnam.

. Other facts which we take to be true are these. The defendant was born in 1918. He and his wife were married in 1941. They were approximately the same age. The defendant then worked as a projectionist in moving picture theatres in the Cape Cod area. In 1944 he was inducted into the military service. He was discharged in 1945. His principal employment immediately thereafter again was as a projectionist. He reënlisted in 1948 and from that time forward made the army his career until he was retired in 1967 with a grade equivalent to that of sergeant. During his career he was assigned to stations in the United States, Europe and Asia. All of his service was in the Signal Corps. His military specialty had nothing to do with weapons, but related mainly to the repair and operation of motion picture equipment and the making of motion pictures at the pictorial center. The only times he got home, other than when he was stationed in New York, were during his annual thirty-day furloughs.

During the defendant's service a monthly allotment was sent home for the support of his family. When he retired from the army and returned to Rochester he was "pretty much a stranger to" his wife. His monthly retirement pay was initially $174 a month; it was later increased to $184 a month. The check arrived the first day of each month. He regularly indorsed the check "[a]t noontime when it came

in the mail" and gave it to his wife who "had the handling of the funds" and who testified: "I always gave him some . . . [f]or his own use . . . about $60 a month," maybe, at times, $30.

The family lived on a "rather tight" budget. The defendant worked only a few weeks a year, at cranberry time, after his retirement. His wife had not worked for five years and during the five preceding years had worked only during the cranberry season.

The defendant liked to hunt. During the duck hunting season, he was seen almost every morning walking across the fields to go hunting. Occasionally Ricky went hunting with him. They then hunted as a team. In the Fall of the year, the defendant went to Maine to hunt deer for a month or two weeks. For deer hunting in Maine he used the Mauser rifle. It could not be used for hunting in Massachusetts.

The defendant habitually slept on a couch in the living room on the first floor of the dwelling; his wife slept in a bedroom on the first floor. Ricky's bedroom was on the second floor above the kitchen. In the floor of Ricky's bedroom there was a hot air register.

The defendant kept all of his guns in a closet in his wife's bedroom. They consisted of several shotguns, a caliber .22 rifle, and the Mauser. The defendant's clothing and his wife's clothing were also kept in the same closet where the guns were stored.

From time to time the defendant had criticised his two sons for prolonged telephone conversations. Sometime in 1968 there were a number of nuisance calls, i.e., the telephone would ring and when answered, the party calling would hang up. The family asked that they be given an unlisted number and this was done. In January, 1969, in exasperation at lengthy telephone conversations by the boys the defendant had torn the instrument from the wall and its use was not restored. He had likewise been critical of the time each boy spent taking a hot shower, requiring for the other the reheating of the limited water supply in the tank from the gas bottle outside the dwelling.

Never, however, had the defendant offered or used physical violence against any member of the household, wife or children, or against anyone else. The defendant was 5 feet 4 inches tall, and weighed about 135 pounds.

There was no eyewitness to the shooting on April 1, 1969. Almost all of the testimony of the events of the day came from the defendant's wife. Ricky left the house at 7 A.M.; Michael at 8 A.M. Mrs. Bearse then saw her husband drinking wine from a quart bottle. Around noontime on that day, "that was our pay day," she went to Wareham to cash "the [p]ension check," paid the bills and came home with $90 which she gave to the defendant for the grocery bill.[1] About 3:30 P.M. her husband came home from work. He was very "intoxicated" and lay down on the couch and went to sleep. Ricky came home at 5 o clock, had his supper and shortly thereafter left. Ricky returned at 7 o'clock. The defendant was awake and said he was going to turn the gas off; the boys were not to take showers. Ricky offered his father $3, but he threw it on the floor and said he did not want it. Her husband was not then intoxicated. Ricky left the house. The defendant's wife went to a neighbor's house at 7:30 P.M. One hour later she returned home. The gas for the gas stove had been turned off. She felt depressed; got into her bedclothes and went upstairs to Ricky's bedroom to lie down. Her head was near the warm air register. Her husband was watching television in the living room. She heard her husband slam a door. He called her downstairs. She went down; "ha[d] a conversation with him," saw the gun on the footstool and saw a shell in his hand, a shell similar to ones he had in his drawer. She returned upstairs to Ricky's bedroom, and again had her head near the opening in the floor. After fifteen minutes she heard Ricky enter the house. He went to the kitchen sink and began to brush his teeth. She heard her husband walk from the living room through the dining room and stop; heard

---

[1] There was an insinuation in the Commonwealth's case that the "grocery bill" included the defendant's "liquor bill," but see fn. 3.

her husband say something and then heard Ricky say, "Don't do it, Dad." Then she heard a gunshot. The entire sequence took only a few seconds. Pursuant to the defendant's instructions his wife called the police from a neighbor's house.

The defendant took the stand. He testified that it was an accident, that he told the police it was his fault, that the rifle had a double trigger mechanism with which he was unfamiliar, that unknown to him there was a bullet in the chamber. He had examined the magazine, as he habitually did, and saw that it was empty. He did not look into or put his finger into the chamber. His purpose in having the gun in his hand was to ask Ricky to clean it with one of the several cleaning fluids which Ricky had in the house and which were acquired from Ricky's part-time employer. When cleaned the defendant intended to sell the rifle.

The defendant has argued seven assignments of error. Considered in isolation we find no reversible error in any one of them. In view of our ultimate conclusion we are of opinion that no useful purpose would be served in discussing them in detail.

Under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, the case before us, being one "in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder . . . in the . . . second degree," is a capital case. The whole case therefore is before us for consideration on the law and the evidence. Upon such consideration, we may, for any reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt. "The amended statute for the first time creates a duty upon our part to consider the degree of guilt. . . . This is a power which the trial court does not have. . . . [W]e must weigh the evidence without . . . seeing the witnesses." Wilkins, C.J., in *Commonwealth* v. *Baker*, 346 Mass. 107, 109.

First of all we are struck by the enormity of the crime of which the defendant has been found guilty, the slaying of his youngest child with malice aforethought. We have

read and reread the evidence with a view to establishing the factual premises upon which the verdict of the jury could be based. As indicated, the significant testimony came from Mrs. Bearse. Her testimony left the clear impression that the defendant was a heavy drinker, if not an alcoholic. On this point her testimony was not only uncorroborated; it was contradicted by the testimony of the sole clerk at the package store he supposedly patronized. This testimony showed an occasional purchase of a six-pack of beer or a quart of wine. The defendant's adult court record shows only a motor vehicle offence in 1946 for which he paid a $20 fine. Reports from the sources which were available to the Superior Court judge and to us show no reason to conclude habitual overindulgence in alcohol.

In our effort to find a clue to the evidential basis or bases of the jury's verdict of murder we examined the Commonwealth's argument to the jury. We touch upon it briefly.

The prosecutor, in his argument to the jury, starting from the initial point that the defendant returned home from the army as "a stranger to" his wife, excoriated him in detail, as a heavy daily drinker, an able bodied man who would not work and thus neglected his family, a man who consequently was "capable of . . . meanness and . . . viciousness," a "cunning personality," a "military man" of training and experience, who shot his son by "design;" "design;" a man who in the face of his wife's testimony was a liar and a murderer. The prosecutor then by measurements and angles which were in evidence, hypothesized the respective positions and postures of son and father, and reconstructed the shooting for the jury; arguing that it must have been deliberate.

The Commonwealth says in its brief that the "core of . . . [its] case rested upon . . . [Mrs. Bearse] hearing her son . . . say 'Don't do it, Dad' and the shot." [2]

---

[2] There was testimony that Mrs. Bearse, two weeks after Ricky's funeral, in response to an inquiry about a newspaper item which referred to an argument between Ricky and his father, replied "There was no argument at that time." ". . . [She] heard a shot or an explosion and came down the stairs and found Ricky." There was no reference to "Don't do it, Dad."

We might be able to say that the verdict of guilty should stand if we could fairly conclude that the jury, unaffected by considerations other than the evidence, were satisfied beyond a reasonable doubt that Ricky made the statement and further could infer beyond a reasonable doubt from the fact of the statement that Ricky was prompted to make it because he saw that his father was intent upon shooting him.

We cannot thus fairly conclude. In further pursuit of the clue that might explain the jury's verdict we have read the opening statement of the prosecutor. In it we find the clue. The prosecutor told the jury that he would prove that the defendant said to Mrs. Bearse on the evening of the fatal event, "I'm going to kill that kid." That proof was never forthcoming. It is of no avail retrospectively to surmise that if made, it was excluded because it was uttered in the course of a private conversation between husband and wife. The statement should never have been included in the opening unless there was no doubt of its admissibility. Having been made, although never proved, it was irretrievably and fatally prejudicial to the defendant in the circumstances, and especially so when the prosecutor in his closing argument repeatedly asserted that the killing was by "design." The so-called "core of the Commonwealth['s] case" which conceivably might have meant "Don't sell it, Dad" was by an unwarranted statement in the opening given the awful meaning "Don't shoot me, Dad."

The evidence, as we read it, does not portray a vicious man, but rather a passive, submissive, solitary, inarticulate man of few needs and no ambition who unfailingly placed his only financial resource at the disposal of his wife.[3]

Pursuant to the duty imposed upon us by G. L. c. 278, § 33E as amended, and consistent with what we believe to be its remedial purpose we conclude that the verdict

---

[3] The unexpended $90 of the April 1 check was in Mrs. Bearse's hands within a few days thereafter through the defendant's son-in-law. The monthly pension checks thenceforth were regularly received at the Rochester address, sent to the defendant, indorsed by him and returned to Mrs. Bearse.

of guilty of murder in the second degree cannot stand. Whether the defendant is guilty of a lesser offence we do not decide.   Our order is:

> Judgment reversed.
> Verdict set aside.
> Case to stand for trial on
>     so much of the indictment
>     as charges involuntary
>     manslaughter.