## COMMONWEALTH *vs.* DAVID MORGAN.

Hampden. February 9, 2007. - June 15, 2007.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Required finding, Assistance of counsel, Comment by prosecutor, New trial, Capital case. *Evidence,* Hearsay, Declaration against interest, Firearm, Exculpatory, Past recollection recorded.

At a murder trial where the Commonwealth proceeded under a theory of deliberate premeditation, the Commonwealth's evidence, which was sufficient to support a conviction of the defendant as a joint venturer, was also sufficient to demonstrate that the defendant was the one who actually murdered the victim. [348-353]

A Superior Court judge hearing a criminal defendant's motion for a new trial did not err in concluding that no ineffective assistance arose from trial counsel's failure to call an allegedly exculpatory witness to testify regarding a statement against penal interest, where the statement contained insufficient indicia of reliability under either State or Federal law [353-357]; further, the judge did not err in concluding that the defendant was not prejudiced by counsel's failure adequately to cross-examine the Commonwealth's firearms expert or by counsel's failure to call a defense firearms expert to testify, where such testimony likely would not have influenced the jury's ultimate conclusion [357-358].

A criminal defendant charged with murder in the first degree failed to demonstrate that a portion of the prosecutor's opening statement, which addressed evidence of a conspiracy charge against the defendant, prejudiced the defendant or deprived him of a fair trial in light of the judge's grant of the defendant's motion for a required finding of not guilty on the conspiracy charge at the close of the Commonwealth's evidence, where the charge of conspiracy did not go to the core of the Commonwealth's murder case, as there was sufficient evidence to convict the defendant without reference to the conspiracy; where the prosecutor did not engage in misconduct or bad faith in the opening statement; and where the judge gave curative instructions to the jury. [358-362]

A Superior Court judge did not err in denying a criminal defendant's motion for a new trial based on newly discovered evidence, where the defendant failed to show that the evidence cast real doubt on the justice of his conviction [362-365]; further, there was no merit to the defendant's contention that the judge abused his discretion at trial by denying the defendant's request to offer a statement under the past recollection recorded exception to the hearsay rule, where the witness could not testify that the statement was truthful when made [365-366].

INDICTMENT found and returned in the Superior Court Department on November 19, 1999.

The case was tried before *Timothy S. Hillman,* J., and a motion for a new trial, filed on February 20, 2004, was heard by him.

*Charles W. Rankin* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. In 2000, the defendant, David Morgan, was convicted of murder in the first degree on the theory of deliberate premeditation.[1] The defendant appealed. In 2004, he filed a motion for a new trial that the trial judge denied. The defendant appealed from the denial of his motion for a new trial and the appeals have been consolidated. The defendant claims that the judge should have granted his motion for a required finding of not guilty because there was insufficient evidence, and erred in denying his motion for a new trial. He also requests that we grant him relief pursuant to our power under G. L. c. 278, § 33E. We conclude there is no merit to any of the defendant's claims of error and that none warrants reversal, and we discern no reason to grant him relief under G. L. c. 278, § 33E. We affirm the defendant's conviction, as well as the denial of his motion for a new trial.

*Facts.* We recite the essential facts the jury were warranted in finding, reserving certain details for our discussion of the issues.

The victim was last seen in the late afternoon of March 3, 1999, getting into a four-door green sedan with the defendant and Floyd Johnson, who was driving.[2] He was not seen again until his body was recovered in Agawam, at the edge of the Connecticut River, on April 18, 1999. When his body was found, the victim was wearing some of the same clothing he was wearing on March 3. He had suffered a gunshot wound to the head at

[1]At the close of the Commonwealth's case the judge allowed the defendant's motion for a required finding of not guilty on an indictment charging the defendant with conspiracy to murder another person. See *infra.*

[2]Floyd Johnson also was indicted for murder and conspiracy to commit murder. The judge granted an unopposed motion to sever his trial from the defendant's during the jury selection process. The Commonwealth eventually entered a nolle prosequi of Johnson's murder indictment.

A third individual, Julian Thompson, also was indicted for murder and conspiracy to commit murder. His trial was severed prior to trial. In his brief, the defendant states that Thompson died prior to his trial.

close range. The medical examiner was able to recover the projectile, a .38 caliber metal jacket that could have been fired from a .357 Magnum or specific types of nine millimeter weapons.

In the days before his disappearance and murder, the victim was living in the basement of a residence in Springfield apart from his wife and children. The victim's wife testified that, on March 1, 2, and 3, 1999, after work, she picked up the victim and drove him to the defendant's apartment so that the victim could obtain marijuana to sell. The wife would drop the victim off at his residence each evening. On March 1, 1999, when the victim's wife took him to the defendant's apartment, the defendant approached the victim, who was sitting in the vehicle's passenger seat, and told him that his apartment had been broken into and that whoever had anything to do with it was "going to feel it."

On March 3, after his wife had brought the victim to the defendant's apartment, she dropped him off at his residence at approximately 5 P.M. Sometime after that, Errol Lodge wanted to purchase marijuana from the victim. The victim invited Lodge to come to his residence and wait in the driveway for a delivery of marijuana. Lodge saw the defendant and Johnson pull up in a green sedan, and he saw the victim speak to the men and then get into the back seat of the vehicle, which sped away. Lodge waited for the victim for a while but left when he did not return.

In statements to police, the defendant did not deny that Johnson drove him in a green sedan to the victim's house between approximately 4 P.M. and 5 P.M. that afternoon. The defendant claimed that he and Johnson went there to pick up money the victim owed and that, once they did so, the pair left. The defendant also told police that the victim could not be trusted because he would "rob you."

At about 8:30 P.M. the evening of March 3, the victim's wife tried contacting him by his pager and received no response, which was uncharacteristic. She tried several times that evening and in the days following, still receiving no response. She went to the victim's residence, and also searched for the victim for several days, before reporting him as a missing person on March 8. The victim's cellular telephone records showed no outgoing calls after March 3.

No physical evidence tied the defendant to the victim's murder. The gun was never found, and a search of the green sedan Johnson was driving, which was routinely cleaned, turned up no fingerprints that matched the victim's. A test of the vehicle yielded the possible presence of human blood on the rear exterior door handle on the driver's side. The defendant's conduct and statements he made to others both before and after the victim's disappearance implicated him in the murder.

1. *Errol Lodge.* After the break-in of his apartment, the defendant told Lodge what had happened and that he knew who did it; pulling a gun from his waist, he said that Lodge "will hear about the person." On March 3, five days before the wife reported the victim missing, the defendant telephoned Lodge at home and, uncharacteristically, kept him on the line for two hours. In the course of the conversation, which was interrupted with the defendant's putting Lodge on hold and instructing him not to hang up, the defendant told Lodge that he had dropped the victim off "somewhere" and "cannot find [the victim]"; the victim's "wife reported him missing"; and "People said I killed him."

When the defendant and Lodge were arrested in June, 1999, on charges of selling marijuana, the defendant told Lodge, "You cannot become an informant. You only charged for weed and weed is a misdemeanor. I will get you out. Don't tell them nothing. Don't tell them nothing."[3] In addition, the defendant gave money to Lodge's girl friend so she could move and paid for an attorney who visited Lodge in jail three or four times. After Lodge's arrest, the defendant kept in contact with Lodge's girl friend, something he had not done before. The telephone calls between the defendant and Lodge's girl friend continued until September, 1999. The defendant was supposed to meet the girl friend to talk because he knew Lodge was talking to police officials and was going to testify against him. The defendant never showed up.

2. *The victim's wife.* At some point during her search for the victim, his wife confronted the defendant, who told her that he did go by the victim's house on March 3, but that the victim

---

[3]Because Lodge was subject to a deportation detainer, he was not eligible for bail.

did not get into the car with him. After speaking to more individuals, the wife later told the defendant that she knew he lied because she had a witness who saw the victim getting into the car with him. The defendant started yelling at her and told her to bring the witness to him; when the wife said that she was going to the police, the defendant stated, "Go to the cops because you can't prove nothing anyways."

3. *Richard McLean.* Richard McLean testified that, before the victim's murder, the defendant and Johnson met with him and showed him a nine millimeter weapon in Johnson's possession; the defendant also possessed a gun. The defendant told McLean that he was going to kill the victim. McLean told the defendant to forget about it, and the defendant responded that if no one saw him do it, there was nothing anyone could do. McLean testified that the defendant also stated, "As a matter of fact that mother fucker gonna be dead in a week anyway."

Two days after the victim disappeared, the defendant met McLean and tried to buy a gun McLean was holding for the victim. McLean asked the defendant why he needed a gun, given that he had seen the defendant's gun. The defendant stated that he needed a "clean gun" because people associated with the victim were after him. When McLean resisted giving him the victim's gun, the defendant stated, "Well, you don't have to worry about [the victim], because [you will] never see [him] again. . . . Trust me. You will never see [the victim] again." Sometime later, the defendant told McLean that the gun that was used to kill the victim was a nine millimeter. In September, 1999, McLean had conversations with the defendant on at least two occasions. In the first conversation, the defendant told McLean that Lodge was going to testify against him for the victim's murder, because Lodge witnessed the victim's departure with the defendant and Johnson the day the victim disappeared. McLean testified that he stated, "You guys pick up somebody to kill him and somebody there seen, and you guys still do it? You guys got to be stupid." McLean testified that the defendant did not say anything in response; instead, he laughed. McLean also testified that, in the second conversation, the defendant told him that he was feeling "fucked up" because he learned that the victim was not the one who had broken into his apartment and that the victim died for the wrong reason.

4. *Warren Smith.* Warren Smith testified that he had seen the defendant with a .45 caliber gun, a .357 Magnum, and a nine millimeter German Luger. He also testified that, during a discussion between Smith, the victim, and the defendant concerning marijuana the defendant allegedly owed the victim, the defendant waved a .45 caliber gun around and stated that if the victim or anybody else tried to rob him, he would kill them. At some point the defendant also bragged to Smith that he shot at an individual who owed the defendant money for marijuana.

5. *Jailhouse witnesses.* The Commonwealth also called two witnesses whom the defendant met while he was incarcerated. One testified that the defendant told him that he was "going down" for a murder but he was going to "bring it to trial to try to beat it."

At the close of the Commonwealth's evidence, the defendant's motion for a required finding of not guilty was denied. See note 1, *supra.* The defendant did not testify at trial. His strategy was to attack the Commonwealth's case, including impeaching the credibility of the Commonwealth's witnesses through cross-examination. He also called three witnesses. The first was the defendant's good friend and landlord, a woman who owned a four-door green Acura automobile that she let the defendant drive. She stated that the defendant was not that upset about the break-in of his apartment. The second witness had been doing carpentry work at the defendant's apartment in March, 1999, and had told police that the defendant was home for the critical time period when the victim disappeared. However, at trial, he testified that he was not sure of the exact date he was at the defendant's apartment. The third witness was a teenaged boy. The victim was staying in the basement of his house. He saw a dark green car on what he believed was the day the victim disappeared, but when police showed him both Johnson's girl friend's and the defendant's landlord's vehicles, he could not positively identify either one.

*Discussion.* 1. *Motion for a required finding of not guilty.* Even though Lodge saw both the defendant and Johnson leave with the victim the day he disappeared, the Commonwealth did not proceed on a theory of joint venture. Conceding that the evidence was sufficient to support a conviction under a joint

venture theory, the defendant argues that the judge should have granted his motion for a required finding of not guilty because the evidence was insufficient to prove that the defendant was the one who actually murdered the victim.

In reviewing the denial of a motion for a required finding, we must determine "whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged." *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). The Commonwealth may submit a case wholly on circumstantial evidence. *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989). "Additionally, the evidence and the [permissible] inferences . . . must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore, supra* at 677, quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). The inferences drawn from circumstantial evidence "need only be reasonable and possible[, not] necessary or inescapable." *Commonwealth* v. *Merola, supra,* quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). The Commonwealth also does not have to prove that no person other than the defendant could have committed the crime. *Commonwealth* v. *Merola, supra,* quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 175 (1980).

Where, as here, a defendant moves for required findings at the close of the Commonwealth's case and at the close of all the evidence, "[w]e consider the state of the evidence at the close of the Commonwealth's case to determine whether the defendant's motion should have been granted at that time. We also consider the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case." *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984).

The defendant, relying on *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), argues that there was no physical evidence connecting him to the victim's death, and that the evidence, viewed in the light most favorable to the Commonwealth, pointed

to an equal possibility that Johnson murdered the victim: he and the defendant traveled together in the drug business; the defendant called Johnson "his boy"; the nine millimeter gun that was shown to McLean was in Johnson's possession; Johnson and the defendant were seen driving off with the victim on March 3; and none of the defendant's statements constituted an actual admission of liability as a principal.

In the *Salemme* case, the defendant and another individual were seated in an otherwise empty restaurant with the victim. The waiter saw the three men talking amicably. *Id.* at 595-596. Because the waiter was not in the dining room for at least ten minutes before the victim was shot, there were no witnesses to the shooting, and both the defendant and the other man were gone by the time police arrived. *Id.* at 596. The Commonwealth waived a joint venture theory of the murder, but evidence supported an equal likelihood that the other individual could have shot the victim. *Id.* 597-598 & nn.4-5. The only other evidence against Salemme was behavior indicating a consciousness of guilt. *Id.* at 598, 602. The court held that this was not enough evidence to sustain Salemme's conviction beyond a reasonable doubt. *Id.* at 602. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965) ("When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof"). The issue here, "then, is whether the evidence pointing to [the] defendant as the actual perpetrator [is] in equipoise with the evidence pointing to [Johnson], or whether there [is] instead evidence pointing more strongly in the direction of the defendant such that the jury could rationally infer that he was the principal." *Commonwealth* v. *Torres*, 442 Mass. 554, 564 (2004) (upholding defendant's conviction of murder of infant even though mother had equal opportunity to commit murder, where evidence showed only defendant had behaved with hostility toward infant and defendant's claim of how mother assaulted infant was inconsistent with medical evidence).

Despite the similarity to the *Salemme* case in which two individuals were last seen with the victim, in this case, we conclude that the evidence did point more strongly in the direction of the defendant's culpability as the perpetrator such that a

jury could reasonably infer that the defendant was the shooter beyond a reasonable doubt. After the defendant's apartment was broken into, he told Lodge that he knew who it was and, waving a gun around, told Lodge that he would hear about that person. In addition, the defendant's statement to police that the victim would rob someone and could not be trusted, coupled with his statement to McLean after the victim's disappearance that he "was feeling real fucked up" because the victim "died for the wrong reason" and that the victim was not the one who broke into the apartment, demonstrates that the defendant thought the victim was the one who robbed him.

The defendant's statements also showed that the defendant was willing to kill the victim: he stated to the victim (and Smith) that if the victim ever robbed him he would kill him, and the defendant told McLean that he was planning to kill the victim and that if no one saw him do it, they could not do anything about it. There was no evidence that Johnson shared this hostility toward the victim. See *Commonwealth* v. *Torres*, *supra* at 564 (hostility toward victim a factor in determining sufficiency of evidence); *Commonwealth* v. *Keniston*, 423 Mass. 304, 307 (1996) (same).

In addition, the defendant was seen in possession of both a nine millimeter gun and a .357 Magnum, both potential murder weapons. At the defendant's instruction, Johnson had shown a nine millimeter gun[4] to McLean, and the defendant told McLean that he had recently given the gun to Johnson, indicating at least some control over the weapon. Furthermore, the defendant bragged about shooting at someone who owed him money and stated that the individual was lucky to get away.

Moreover, on the evening that the victim disappeared, the defendant telephoned Lodge, the one eyewitness to the victim's getting into a vehicle with the defendant and Johnson. The defendant clearly manufactured a story about the victim's wife reporting the victim missing and then stated that "people" were saying that he killed the victim. A rational jury could infer that, because on the evening of March 3, the wife did not even know that the victim was missing, it would be unlikely that "people"

---

[4] It is not clear whether the nine millimeter guns testified to by Smith and McLean were the same.

would be saying that the defendant killed the victim at that point in time.[5] The jury could also reasonably conclude that if Johnson were the shooter, it would make no sense for the defendant to place himself in the murderer's role by ascribing greater culpability to himself. In addition, the defendant's telling Lodge not to become an informant, as well as his paying for an attorney and giving money to Lodge's girl friend, could be seen as an attempt to ingratiate himself with Lodge.

The defendant argues that in cases where this court has found sufficient evidence to determine who among a number of possible suspects committed a crime, there was more than evidence of motive and consciousness of guilt, citing *Commonwealth* v. *Torres, supra* at 564-566 (evidence sufficient where it demonstrated hostility and where account of mother's injuring infant did not comport with medical evidence); *Commonwealth* v. *Melton,* 436 Mass. 291, 300 (2002) (evidence sufficient where it demonstrated hostility, and where it demonstrated that weapon used in killing was in defendant's possession earlier that evening, and that defendant was seated in vehicle closest to window from which shot was fired); and *Commonwealth* v. *Keniston, supra* at 307-308 (evidence of hostility and other physical evidence sufficient). However, the defendant neglects to mention that, here, he specifically told McLean that he intended to kill the victim.

The defendant does not argue that the Commonwealth's case deteriorated after the defense presented its case. The evidence was in the form of testimony that the jury were entitled to disbelieve. *Commonwealth* v. *Lao,* 443 Mass. 770, 780 (2005). See *Commonwealth* v. *O'Laughlin,* 446 Mass. 188, 203 (2006), quoting *Kater* v. *Commonwealth,* 421 Mass. 17, 20 (1995) ("Deterioration would occur . . . because evidence for the Commonwealth necessary to warrant submission of the case to

---

[5]The wife testified that, because the victim had not answered her continuous pages, she drove to his residence at about 10:30 P.M. on March 3 and knocked on a window. When she received no response, she concluded that he was sleeping.

The defendant's telephone call to Lodge occurred several hours before the victim's wife made her first trip to the victim's residence. Lodge's girl friend testified that, although she did not recall the exact time that the telephone call from the defendant was received, she guessed that it was only 4 or 5 P.M.

the jury is later shown to be incredible or conclusively incorrect'').

2. *Motion for a new trial.* The defendant raised several issues in his motion that the judge denied after an evidentiary hearing.[6] In his brief, the defendant claims that the judge erred in denying his motion because his counsel was ineffective, the portion of the prosecutor's opening statement that addressed the conspiracy charge was prejudicial and should have resulted in a mistrial, and newly discovered evidence concerning McLean would have led to a different verdict.

We present the facts as found by the judge and give special deference to the decision of the judge who, as here, also was the trial judge. *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004). Where the denial of a motion for a new trial "is considered . . . in conjunction with a defendant's direct appeal from a conviction of murder in the first degree," we must determine whether, under G. L. c. 278, § 33E, there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Hill*, 432 Mass. 704, 710 n.14 (2000).

a. *Ineffective assistance of counsel.* The defendant argues that the judge erred in concluding that counsel was not ineffective because she failed to call a witness and a firearms expert. "[W]e need not focus on the adequacy of trial counsel's performance, but rather examine 'whether there was an error . . . (by defense counsel . . .) and, if there was, whether that error was likely to have influenced the jury's conclusion.' " *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 393 (1995).

(i) In his motion, the defendant argued that his counsel was ineffective for not calling Katie Wells, a friend of the victim, as an exculpatory witness. Wells would have testified that a third party told her that he had shot the victim. The judge concluded that there was no ineffective assistance of counsel because Wells's testimony would not have been admissible as a state-

---

[6]At the evidentiary hearing, the judge heard testimony concerning only three of the issues the defendant raised in his motion for a new trial: ineffective assistance of counsel for failure to call a witness; whether the Commonwealth knowingly presented perjured testimony; and the import of newly discovered evidence concerning McLean's deportations.

ment against penal interest because the defendant did not demonstrate that the third party was unavailable. The judge further concluded that the third party's statement did not satisfy indicia of reliability and thus did not fall under either the third prong of the statement against penal interest test set forth in *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986), or the exception carved out by the United States Supreme Court in *Chambers* v. *Mississippi*, 410 U.S. 284 (1973). The defendant argues that this was error.

At the evidentiary hearing Wells testified that, around the time the victim disappeared, she met a man in a parking lot who was later identified as Howard Livingston.[7] They spoke to each other over the telephone a few times hoping to "hook[] up." During one conversation, they were discussing the individuals they knew in Springfield's Jamaican community. When Wells mentioned the victim, she testified that Livingston responded, "I don't like him, you won't see him anymore. I shot him in the head and threw him in the river . . . ."[8] Subsequently, Wells learned of the discovery of the victim's body in the Connecticut River and that he had been shot in the head. She went to the Agawam police and gave them a statement on April 20, 1999, concerning Livingston.

As a result of Wells's statement, Agawam police questioned Livingston, who denied that he had anything to do with it. Wells testified that after he was questioned by police, Livingston threatened her and that shortly before the evidentiary hearing, Wells encountered Livingston and he gave her a "dirty look."

Trial counsel testified that she reviewed Wells's statement to police, sent summonses to both Wells and Livingston, but did nothing to follow up on them. Wells had moved from the address to which the summons was sent and testified that she had not been contacted by defense counsel at all. Defense counsel did receive a criminal history of Wells, containing a docket that showed she had been charged with larceny.

---

[7]Wells knew him as "Mike." She learned his name after she chose his photograph from a police array.

[8]The judge noted that, in her statement to the police, Wells stated that Livingston had said, "Me not like him (repeated three times) . . . me shot him in the head and threw him in the river for the fish to eat."

A statement is admissible under the statement against penal interest exception to the hearsay rule if "(1) the declarant's testimony is unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth* v. *Charles,* 428 Mass. 672, 677 (1999), quoting *Commonwealth* v. *Drew, supra.*

We need not address whether Livingston was unavailable because, even assuming he was,[9] we agree with the judge that the statement contained insufficient indicia of reliability under either State or Federal law. In discussing the statement against penal interest exception to the hearsay rule, the court in the *Drew* case listed factors a judge should consider in assessing whether there is some reasonable likelihood that a proposed hearsay statement could be true, "in light of the other evidence already adduced or to be adduced," including the credibility and reliability of the declarant and the credibility and probative value of the statement; the timing of the declaration; the relationship between the witness and the declarant; whether the statement was heard by others; whether the statement was made spontaneously; whether and in what circumstances the statement was repeated; and whether there was a motive for the declarant to misrepresent the matter. *Commonwealth* v. *Drew, supra* at 75-76, and cases cited.

Under Federal law, a hearsay exception may not be applied mechanistically to defeat justice. *Chambers* v. *Mississippi, supra* at 302. In *Chambers* v. *Mississippi, supra* at 287-288, 292-

---

[9]We note two of the presumptions on which the defendant's claim of Livingston's unavailability rests: (1) if Livingston were called as a witness he would have invoked his privilege against self-incrimination, and (2) if Livingston did testify consistent with his statement to police, then Wells's statement would have been admissible to impeach him. See *Commonwealth* v. *Charles,* 428 Mass. 672, 679 (1999), citing *Commonwealth* v. *Lopera,* 42 Mass. App. Ct. 133, 136 n.3 (1997) ("As a general matter, it should not be presumed that an absent witness may invoke his or her privilege against self-incrimination"). See also *Commonwealth* v. *McAfee,* 430 Mass. 483, 489-490 (1999), citing *Commonwealth* v. *Benoit,* 32 Mass. App. Ct. 111, 114-115 (1992) (pursuant to G. L. c. 233, § 23, party cannot call witness he knows will offer nothing relevant solely to impeach witness with otherwise inadmissible evidence).

293, a third party, McDonald, confessed to the murder with which Chambers was charged to several other individuals including, within twenty-four hours of the crime, two close friends. McDonald also signed a sworn confession, which he later recanted. *Id.* at 287-288, 292. There also were two witnesses; one saw McDonald shoot the victim, and the other saw McDonald with a gun in his hand immediately after the shooting. *Id.* at 289. Mississippi had an evidentiary rule that prevented the defendant from cross-examining McDonald and did not have a statement against penal interest exception to the hearsay rule. *Id.* at 291-292, 295-296, 299. The United States Supreme Court reversed Chambers's conviction because the indicia of trustworthiness of McDonald's confessions were so overwhelming that excluding evidence of them violated Chambers's right to a fair trial. *Id.* at 302-303.

Here, we do not agree with the defendant that the timing of Wells's statement that accurately reflected that the victim had been shot in the head and thrown in the river and the fact that Wells and Livingston did not know each other well makes this case like the *Chambers* case. There was no other corroboration. As the judge stated:

> "Here, after Wells made her statement to [Agawam police] on April 20, 1999, the police questioned Howard Livingston on May 10, 1999. Other than Wells['s] statement, there was no other eyewitness testimony or tangible evidence connecting Livingston to the crime. Moreover, the alleged statement was not made spontaneously,[10] nor did other witnesses hear the statement or was it repeated. Finally, Wells and Livingston were not close friends, as had been in *Chambers*. The two had met in a parking lot, exchanged numbers, and spoke on the phone only a few times with the hope of 'hooking up.' . . . Thus, Wells['s] statement was pure hearsay . . . ."

Thus there was no substantial likelihood of a miscarriage of justice in defense counsel's failure to call Wells because Livingston's statement would have been inadmissible and because, as the judge noted, "[t]here was no other information in discovery

---

[10]The defendant argues that the judge erred in finding that the statement was not spontaneous. We disagree. Wells testified that she first mentioned the victim's name to Livingston.

that supported a second look at Livingston." Contrast *Commonwealth* v. *Galloway*, 404 Mass. 204, 209 (1989) (third party's admissions should have been admitted because corroboration by witness to events "tips the balance clearly in favor of admissibility"); *Commonwealth* v. *Fiore*, 53 Mass. App. Ct. 785, 791-792 (2002) (statement should have been admitted where corroborated by witness testimony).

(ii) At trial, a State trooper testified that the projectile that was recovered from the victim came from an unknown weapon with the capability of firing .38 caliber class ammunition. He also stated that the weapon from which the ammunition was fired possessed a rifling system with five lands and grooves with a right twist, which is consistent with either nine millimeter pistols or .357 Magnum handguns. The trooper never testified as to which weapon was more likely the type used in the murder, nor did defense counsel pursue this question during cross-examination.[11]

In his motion, the defendant argued that defense counsel denied him a substantial ground of defense by failing adequately to cross-examine the Commonwealth's firearms expert and by failing to call a defense firearms expert to testify. In support of his motion, the defendant submitted an affidavit from the expert his trial counsel had hired. The affidavit stated that the expert would have testified that there is only a ten per cent chance that a nine millimeter pistol could fire .38 caliber class ammunition.[12] The defendant argues that this testimony not only would have called into question whether the victim could have been killed by a nine millimeter pistol, but also could have been used effectively to impeach McLean's trial testimony that he saw the defendant with a nine millimeter pistol and that the defendant told him that the victim was killed with a nine millimeter pistol. The defendant further argues that the expert's information would have weakened the prosecutor's attempt to link, in closing argument, McLean's testimony and the State trooper's testimony.

The judge concluded that the defendant was not prejudiced

---

[11]The defendant's trial counsel stated in her affidavit that her failure to cross-examine the trooper regarding the likelihood that a nine millimeter pistol could have been used to kill the victim was not a strategic decision.

[12]Trial counsel's affidavit also stated that the expert told her that the specific rifling system was "more common in .38 revolvers than nine millimeter pistols."

by counsel's failure to cross-examine the State trooper further and to call the expert to testify concerning the pistol. There is no substantial likelihood of a miscarriage of justice, because the expert's testimony likely would not have influenced the jury's ultimate conclusion. Even if the defendant's firearms expert testified that less than ten per cent of weapons with five lands and grooves with a right twist are nine millimeter pistols, the defendant's expert could not have excluded a nine millimeter pistol as the murder weapon. Moreover, the Commonwealth never conclusively stated which weapon was used. The Commonwealth presented evidence that the defendant was observed with two weapons that could have fired .38 caliber ammunition and never suggested that a nine millimeter pistol was the only possible murder weapon. Instead, the Commonwealth suggested that a nine millimeter pistol could have been used, an inference that was supported by the Commonwealth's evidence from the trooper, McLean, and Smith. See *Commonwealth* v. *Coren*, 437 Mass. 723, 730 (2002) (prosecutor permitted to argue "inferences that may be reasonably drawn from the evidence").

b. *Prosecutor's opening.* In addition to being indicted for the victim's murder, the defendant and two codefendants were also indicted for conspiracy to murder Tanashe Edwards. See notes 1 and 2, *supra.* The Commonwealth's theory was that the defendant killed the victim because he believed that the victim had broken into his apartment, only to discover later that Edwards and another individual, Jamal Peters, committed the break-in. The Commonwealth charged that the defendant then conspired with Peters and the two codefendants to kill Edwards. Peters apparently went to the police.

The judge allowed the Commonwealth's oral motion for joinder of both indictments against the defendant. The defendant objected. Prior to the prosecutor's opening statement, the judge limited the prosecutor to general references to the meeting that allegedly occurred between the defendant and the codefendants.[13] The judge also stated that he was concerned about the prosecutor's

---

[13]The judge specifically requested that the prosecutor "only refer generally to the meeting," and "refer generally to the alleged agreement . . . but I'm going to ask you not to get into the specific statements on your opening. I want to get a little more context with respect to the evidentia[ry] foundation."

mentioning specific statements of the codefendants but was not concerned about Peters's statement regarding Edwards and his breaking into the defendant's apartment.[14]

In compliance with the judge's limiting instructions, during opening statements, the prosecutor stated that Peters would testify that he attended a meeting with the defendant and two other individuals, where they agreed to kill Edwards. After the prosecutor's opening statement, the defendant moved for a mistrial. The defendant objected to the portion of the prosecutor's opening statement that included:

> "And at that meeting it was determined that the way that Mr. Peters would get himself off the hook after being interrogated by the defendant as to 'who else robbed my apartment, what did you take, and what did you do with it.' After the conversation it was determined amongst the group that Mr. Peters would set up Mr. Edwards by . . . luring him into a car to smoke [marijuana]. . . . 'You get . . . Edwards in that car . . . and we'll take care of it. We'll do what we have to do. We'll take care of him.' "

During the trial, the Commonwealth was unable to provide evidentiary support for the conspiracy charge other than hearsay statements allegedly made by the defendant and his codefendants.[15] Consequently, the judge excluded Peters's testimony as hearsay. At the close of the Commonwealth's evidence, the judge also allowed the defendant's motion for a required finding of not guilty on the indictment charging conspiracy. In his instructions to the jury, the judge stated that at the beginning of trial they had been told that they would be deciding the guilt or innocence of the defendant on two charges, the victim's murder and the conspiracy to murder another person. The judge stated that the jury were "now being asked only to decide the guilt or innocence of the defendant with respect to the indictment" charging murder of the victim. At sidebar, defense counsel stated that this instruction was "difficult" because the jury were reminded of the con-

---

[14]In particular it was the following statement of one of the codefendants: "I know he was the wrong one. I knew [the victim] didn't do it."

[15]See *Commonwealth* v. *Beckett*, 373 Mass. 329, 337 n.3 (1977) (statements of coconspirators are inadmissible unless there is sufficient evidence to support inference that conspiracy existed).

spiracy charge "without knowing why they are not getting to rule" on it.

In his motion, the defendant argued that the judge erred in not granting a mistrial because the prosecutor's opening statement deprived him of a fair trial. The judge concluded that the defendant was not prejudiced or deprived of a fair trial because the prosecutor did not engage in misconduct or bad faith in the opening statement, and because the judge gave specific instructions to the jury concerning opening statements, disallowed Peters's testimony, and allowed the defendant's motion for a required finding of not guilty. The defendant argues that the judge's curative instructions to the jury were not enough to remedy the judge's error in allowing mention of the conspiracy at all given the lack of foundation, and that the prosecutor acted in bad faith in exceeding the judge's limiting instructions. He also argues that the judge ignored his argument that his counsel was ineffective for not renewing the motion for a mistrial when the motion for a required finding of not guilty was granted.

In an opening statement, a prosecutor is permitted to state what he or she expects to prove by evidence. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 382 (1992), citing *Commonwealth* v. *Fazio*, 375 Mass. 451, 454 (1978). A prosecutor also may "argue inferences from the evidence favorable to [the Commonwealth's] case." *Commonwealth* v. *Johnson*, 429 Mass. 745, 748 (1999), quoting *Commonwealth* v. *Lyons*, 426 Mass. 466, 472 (1998). If a prosecutor's statement exceeds the boundaries of what is permissible, a trial judge has broad discretion in declaring a mistrial based on whether the statement resulted in prejudicial error. See *Commonwealth* v. *Thomas*, 429 Mass. 146, 157 (1999).

The defendant relies on *Commonwealth* v. *Bearse*, 358 Mass. 481, 487 (1970), to argue that the judge should not have allowed the prosecutor to mention the conspiracy, unless there was no doubt that it would be admissible. However, "out-of-court statements by joint criminal venturers are admissible against the others if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). In addition, "[t]he judge need not make a preliminary finding that a

joint criminal enterprise exists as a precondition to admitting the evidence. Evidence may be admitted subject to a later motion to strike if the prosecution fails to show that the defendant was part of a joint enterprise." *Commonwealth* v. *Colon-Cruz, supra* at 543-544. See *Commonwealth* v. *Collado,* 426 Mass. 675, 681-682 (1998) (in jury trial, "it is sufficient" that statements of co-venturer be admitted before evidence demonstrating joint venture, as long as evidence is subject to motion to strike). The holding of the *Bearse* case has been limited to its special circumstances: where the prosecutor's opening statement had the effect of changing the meaning of the statement, "Don't do it, Dad," spoken by a son when his father approached him while holding a gun, from "Don't sell it, Dad," to "Don't shoot me, Dad." *Commonwealth* v. *Fazio, supra* at 455. In the *Bearse* case, the court held that the statement was overwhelmingly prejudicial because it went to the core of the Commonwealth's case. *Id.* at 487.

This case, however, "does not present a situation where the force of the prosecutor's opening remarks was overwhelmingly prejudicial and likely to leave an indelible imprint on the jurors' minds." *Commonwealth* v. *Fazio, supra* at 455. It is true, as the defendant claims, that in seeking joinder of the indictments, the Commonwealth argued, inter alia, that the conspiracy charge was intertwined with the victim's murder and would give the jury a complete picture. Although the charge of conspiracy certainly bolstered the Commonwealth's theory concerning the defendant's motive to kill the victim, we conclude that it did not go to the core of the Commonwealth's case, as was the case in *Commonwealth* v. *Bearse, supra.* As discussed, there was sufficient evidence to convict the defendant without reference to the conspiracy.

There is no evidence here to suggest that the prosecutor made any statement in bad faith. See *Commonwealth* v. *Thomas, supra.* The fact that the judge determined during trial that Peters's testimony would be excluded as hearsay does not demonstrate that the prosecutor acted in bad faith. *Commonwealth* v. *Breese,* 381 Mass. 13, 15-16 (1980) (if testimony mentioned in opening statement "does not materialize, it will not be presumed that the prosecutor acted in bad faith"). Indeed, the judge stated that he had spent considerable time deciding whether there was other

evidence that would have allowed Peter's testimony to be admitted in evidence.

The defendant also argues that the prosecutor exceeded the judge's instructions to exclude statements by the codefendants when he stated, "You get . . . Edwards in that car . . . and we'll take care of it. We'll do what we have to do. We'll take care of him." The defendant argues that these were "statements by members of the group." It is not clear whether these were exact statements from the codefendants. However, even if they were, considering the prosecutor's statements "in the context of the entire argument and in light of the judge's instructions to the jury and the evidence [introduced] at trial," *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992), we conclude that there was no prejudice.

Here, the judge instructed the jury prior to and immediately after opening statements, prior to closing arguments, and during his final instructions to the jury that the opening statements should not be considered evidence. Any potential prejudice resulting from the prosecutor's statements was corrected by the judge's curative instructions concerning opening statements throughout the proceedings. Moreover, these statements did not go to the core of the Commonwealth's murder case. Given the judge's broad discretion in determining whether a mistrial should be declared, we "defer to [the] judge's determination of whether the prosecutor committed prejudicial error, how much any such error infected the trial, and whether it was possible to correct that error through instruction to the jury."[16] *Commonwealth* v. *Thomas, supra.*

c. *Newly discovered evidence.* In his motion for a new trial the defendant claimed that there was newly discovered evidence concerning Commonwealth witnesses McLean and Smith. It is not contested that the evidence concerning both witnesses was newly discovered. *Commonwealth* v. *Shuman*, 445 Mass. 268, 271-272 (2005), and cases cited (defendant must establish that evidence was unknown to him or trial counsel and not reasonably discoverable at time of trial). It is in the sound discretion

---

[16]As there were no grounds for a mistrial, defense counsel's failure to request one at the close of the Commonwealth's evidence did not constitute ineffective assistance of counsel.

of the judge whether to grant or deny a motion for a new trial based on newly discovered evidence. *Commonwealth* v. *Cintron*, 435 Mass. 509, 517 (2001). The defendant must show that the evidence casts "real doubt on the justice of the conviction." *Commonwealth* v. *Shuman*, *supra* at 272, quoting *Commonwealth* v. *Salvati*, 420 Mass. 499, 506 (1995). The new evidence must be material and credible, and must support the defendant's position. *Commonwealth* v. *Shuman*, *supra*, and cases cited.

*Richard McLean.* After his trial, the defendant discovered that Richard McLean had been deported twice from the United States and was in the country illegally. The defendant argued in his motion that if he had had the information that McLean was subject to prosecution for illegal reentry, he would have been able to use it for cross-examination purposes, allowing the jury to infer that McLean was "looking for a lot of consideration in exchange for his testimony."

Referring to McLean by one of his aliases, Washington Betton, the judge found:

> "[D]espite not having the information regarding Betton's two deportations and potential charges for re-entry, [counsel] had no problems attacking Betton's credibility with the information that was in her possession. She first attacked Betton with evidence that he went by multiple aliases including Richard William McLean, Richard Joseph McLean, Richard Lephaneo McLean, Glenn Roy McLean, Washington Betton, Devon Andrew Perry, Devon Anthony Rhoden, Dennis Anthony Tajah . . . ; his driver's license and passports were under false names . . . ; he used seven different birth dates and three [S]ocial [S]ecurity numbers . . . ; he had been convicted in California for possession of cocaine under a different alias . . . ; he had pending charges in San Bernadino, as well as his Los Angeles marijuana charges . . . ; he lied on multiple occasions to the Massachusetts State Police . . . ; and he was [a] drug dealer . . . ."

We agree with the judge's conclusion that "in light of [counsel's] work on cross-examination . . . the newly discovered information regarding McLean's two deportations, would [not]

have influenced the jury anymore than was done at trial."[17] *Commonwealth* v. *Lo*, 428 Mass. 45, 53 (1998), quoting *Commonwealth* v. *Ramirez*, 416 Mass. 41, 47 (1993) (new trial not ordinarily granted where newly discovered evidence merely impeaches credibility of witness). See also *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004) (special deference given to decision of judge who also was trial judge); *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992) (same). Although the judge did not discuss it in his memorandum of decision, we note that defense counsel devoted time to attacking McLean's credibility in her closing argument and stated that even though McLean denied that he was receiving consideration for his testimony, the jury had a document that showed that he was.

*Warren Smith.* Smith, who was being held at the Franklin County house of correction, sent a letter to the defendant's trial counsel claiming that he lied during his testimony at trial because of pressure from the prosecutor. In his motion, the defendant argued that this newly discovered evidence warranted a new trial. At the hearing on the motion, Smith testified, and the judge found, that the letter was not true. Smith stated that he wrote it because he was concerned that if he were deported to Jamaica, the defendant, a former member of the Jamaican police force, would have his friends kill Smith. He testified that he wanted the defendant to know that he was forced to testify and he thought defense counsel was the only way he could communicate with the defendant to persuade him to intercede with his friends in Jamaica. The judge concluded that, given that it was well documented that Smith was under threat if he returned to Jamaica, that he refused to sign an affidavit concerning the information he included in his letter to defense counsel, and that his testimony at the motion hearing was consistent with his trial testimony, a new trial was not warranted.

[17]The defendant does not challenge the judge's findings that the Commonwealth did not know of McLean's deportations and illegal entry. We conclude from our review of the record that there was no error in the judge's finding and thus there is no substantial likelihood of a miscarriage of justice. The defendant's argument, without citation to authority, that McLean's knowledge that he was subject to prosecution for illegal entry made him aware that he might be discovered by authorities and thus had a strong incentive to lie to ingratiate himself to the Commonwealth "clearly constitutes evidence relevant to potential bias," adds nothing to the discussion.

Before trial, in response to the defendant's request for exculpatory evidence concerning promises to witnesses, the prosecutor wrote, "[T]he Commonwealth has offered no promises, rewards or inducements to Mr. Smith. Mr. Smith has no present matters other than immigration. He was told that his cooperation will be taken into consideration." At trial, Smith testified that he was not promised consideration for his testimony but would expect some concerning his immigration issue. However, after trial, the prosecutor and a State trooper learned of the death threats against Smith in Jamaica. The prosecutor gave Smith an asylum application, still not promising that he would help. When the application was denied, a State trooper wrote a letter on Smith's behalf to the immigration authorities. The defendant pointed to this intercession on Smith's behalf to argue that the Commonwealth withheld evidence that Smith was going to receive consideration in return for his testimony. Smith, the prosecutor, and the State trooper testified at the hearing on the defendant's motion for a new trial. The judge concluded that because these events did not occur until after trial, the government's pretrial response to the defendant had fully disclosed the extent of its understanding with Smith and that Smith did not misrepresent the understanding at trial.[18]

Having reviewed the relevant parts of the record, we conclude that the judge did not err in denying the defendant's motion based on evidence concerning Smith.

d. *Past recollection recorded.* The defendant called an alibi witness to the stand who testified that about the time the victim disappeared, he (the witness) was working at the defendant's apartment from approximately 8 A.M. until 8 P.M., and the defendant did not leave the premises except for a brief period at lunch time. Although his statement to police stated that the date that he was working was March 3, at trial he testified that he could not recall the exact date. In his motion for a new trial, the defendant argued that the judge abused his discretion in denying his request to offer the witness's statement to police under the past recollection recorded exception to the hearsay rule.[19] At the

[18]The judge noted that at the time of his written memorandum of decision on the defendant's motion for a new trial, Smith was still being held in the Franklin County house of correction for criminal activities in Massachusetts as well as a deportation retainer.

[19]The defendant does not address this issue in the briefs he submitted to this court.

hearing on the motion, the witness testified that he told police when he made the statement that he was not sure of the exact date in March that he was at the defendant's apartment.

We agree with the judge's conclusion that he did not abuse his discretion in excluding the witness's statement to police. The discretionary admission of a past recollection recorded exception to the hearsay rule is only proper "if (1), the witness has no revivable recollection of the subject, (2) the witness had firsthand knowledge of the facts recorded, (3) the witness can testify that the statement was truthful when made, and (4) the recording was made when the events were fresh in [the witness's] memory." *Commonwealth* v. *Nolan*, 427 Mass. 541, 543 (1998). As the judge properly concluded, in light of the witness's testimony that he told police he was unsure of the date at the time he made the statement, the third prong of this test is not met. *Commonwealth* v. *Greene*, 9 Mass. App. Ct. 688, 690 (1980), quoting 3 J. Wigmore, Evidence § 746(2) (Chadbourn rev. ed. 1970) (witness required to "assert that the [past recollection recorded] correctly represented his knowledge and recollection at the time of making").

3. *G. L. c. 278, § 33E.* We have reviewed the entire record and discern no reason to exercise our power pursuant to G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*