COMMONWEALTH *vs.* ANTHONY PARREIRA.

No. 06-P-749.

Middlesex. April 4, 2008. - August 4, 2008.

Present: GRAHAM, DREBEN, & WOLOHOJIAN, JJ.

*Rape. Joint Enterprise. Evidence,* Joint enterprise, Tape recording, Credibility
of witness. *Practice, Criminal,* Instructions to jury, Jury and jurors, New
trial, Conduct of prosecutor, Assistance of counsel. *Jury and Jurors. Wit-
ness,* Credibility.

A trial court judge erred in denying a criminal defendant's motion for a
required finding of not guilty on two indictments (on which the defendant
was convicted of statutory rape on a theory of joint venture), where there
was no evidence from which a jury could reasonably infer an agreement
between the defendant and a third party that the defendant be willing and
available to help the third party accomplish the third party's rape of the
victim. [311-314]

The evidence at the trial of a criminal indictment charging rape was sufficient
to demonstrate that the defendant had used force. [314]

At the trial of indictments charging rape, the instructions to the jury clearly
stated that force was a distinct element of rape [314-315]; further, the
judge's response to the jury's question regarding unanimity did not have a
coercive effect on the jury's guilty verdict [315-316], and the judge's
charge to the jury after they advised that they were unable to reach a
verdict was neither premature nor coercive [316].

A criminal defendant failed to demonstrate that his right to be present during
the evidence-taking part of his trial was violated when an audiotape rec-
ording made of his police interview was admitted in evidence, although
not played, during trial. [316-317]

At the trial of indictments charging rape and statutory rape in which the
defendant's strategy entailed highlighting who the victims told and did not
tell about the incident and when they did so, there was no error arising
from the judge's permitting the Commonwealth to later elicit testimony on
the same topic. [317-318]

A criminal defendant seeking a new trial failed to demonstrate either prosecu-
torial misconduct or ineffective assistance of counsel. [318-320]

INDICTMENTS found and returned in the Superior Court Depart-
ment on December 16, 2004.

The cases were tried before *Peter M. Lauriat*, J., and a motion for a new trial, filed on February 1, 2007, was considered by him.

*Estera Halpern* for the defendant.

*Fawn D. Balliro*, Assistant District Attorney, for the Commonwealth.

WOLOHOJIAN, J. The defendant was indicted on four counts of rape of a child by force in violation of G. L. c. 265, § 22A, two of which (counts 3 and 4) were based on a theory of joint venture. The defendant was found guilty on one of the indictments (count 1), but on the remaining three (counts 2-4), he was convicted of the lesser included offense of statutory rape. The defendant has appealed the convictions and the denial of his motion for new trial.

*Background.* Two fifteen year old girls, whom we shall call Jane and Mary, made a plan to get drunk on Halloween, 2004. Not being able to purchase alcohol legally themselves, they decided to enlist the defendant, who was the friend of a friend. The defendant (who was eighteen) was underage as well; however, the girls had heard that he had fake identification and would be able to buy alcohol for them. The girls did not know the defendant well, but they knew another boy (Danilo Barros) who did. They called Barros, and in turn, Barros and the defendant met the girls, as they requested, at a restaurant in the city of Marlborough. There, the girls told of their desire to get drunk on Halloween (which was the next day), and the defendant agreed to buy alcohol for them then.

Sometime during the late afternoon of Halloween, the girls, after dressing up "goofy" by putting shorts on over their jeans, each took a caffeine pill which they thought would help them "get high." They then called the defendant and Barros. The boys arrived in the defendant's car, and all four teenagers went to a local liquor store where the defendant, using money given to him by the girls, bought a six-pack of Smirnoff "twisted five raspberry," a flavored vodka drink.

The girls were uncertain where to go to accomplish their plan of getting drunk. Someone suggested a wooded spot near a cul-de-sac, and the defendant drove the foursome there. Once there, the girls each drank half of the six-pack, while the four teen-

agers conversed. By the time the girls had finished drinking, they were feeling dizzy and nauseous. When they decided to leave, the boys each spun one of the girls around a few times, apparently to heighten the effect of the alcohol.

The girls each testified that, until this point, they were neither afraid nor nervous. The day had proceeded as they had wished. Although the boys, both of whom are of Brazilian heritage, occasionally spoke between themselves in Portuguese, this caused the girls no alarm even though neither girl understood what was being said.

After they finished drinking, the girls asked to be taken to Mary's boyfriend's house. Instead, the defendant drove them to an apartment complex a short distance from Mary's house. The defendant spoke with a resident who let all four into the building, and after some searching, the boys found a vacant apartment. Jane had previously attended parties held in vacant apartments in this complex, which was within walking distance of Mary's home. As before, the boys continued to speak occasionally between themselves in Portuguese.

The defendant left the apartment for a while, although it is unclear for how long or where he went. During his absence, the girls spoke to Barros, who complained about his girlfriend, a good friend of Mary's. The conversation became more sexualized; Mary became uncomfortable and went into another room of the apartment. Jane went there also, followed by Barros and the defendant (who had by this time returned). Conversation resumed along sexual lines, with the boys "kind of insisting that we do stuff with them." Mary testified, "[F]irst they were just saying that we could be in the same room and I said 'no.' And then they said that [Jane] and Anthony [the defendant] could go in the closet, and I still said 'no.' "

Ultimately, the two girls willingly ended up in separate rooms of the apartment: Jane with the defendant, and Mary with Barros. The conduct on which the indictments were based occurred while each girl was paired off with one of the boys in separate rooms of the apartment.

As to Jane, she "got[] a little nudge" from the defendant and ended up unwillingly on the floor of a closet in one of the bedrooms. There, the defendant removed her shorts, pants, and

underwear, and then penetrated her with his finger and penis. Throughout, Jane said "no" and that she "didn't want to do anything, and . . . wanted nothing to happen." She made crying noises. Jane's first request that the defendant stop went unheeded. When she asked him a second time to stop, he did so. At that point, Jane pushed the defendant off her and returned to the main room of the apartment.

Meanwhile, in the other bedroom, Barros removed Mary's shorts, pants, and underwear and penetrated her with his fingers and tongue. Mary "kept saying, 'no, no, no' " but could not move because Barros's hand was on her chest. Barros stopped when the defendant opened the door. At that point, Mary got dressed and went into the main room of the apartment where she found Jane, who was "scrunched up" on the floor, crying.

The two boys and the two girls then got into the defendant's car, and at their request, the girls were dropped off close to Mary's boyfriend's house. At that point, Jane and Mary told each other what had happened when they were in the separate bedrooms of the vacant apartment.

*Discussion.* The defendant raises numerous issues on appeal. First, he argues that his motion for a required finding of not guilty on the indictments charging joint venture was incorrectly denied. Second, he contends that his motion for a required finding of not guilty was improperly denied because there was insufficient evidence of force. Third, he claims error in the jury instructions regarding force and joint venture. Fourth, he claims errors in the instructions and answers given during jury deliberations. Fifth, he argues that his constitutional right to be present at trial required that an audiotape of his interview with the police be played in open court. Sixth, he contends that self-corroborative statements were improperly admitted. Seventh, the defendant contends that his motion for a new trial was erroneously denied.

1. *Joint venture.* At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty on counts 3 and 4, charging him as a joint venturer for Barros's rape of Mary in violation of G. L. c. 265, § 22A (rape by force of a child under age sixteen). The judge denied the motion, and the defendant was convicted on a theory of joint venture of the lesser included offense of statutory rape on both indictments.

We review to determine "whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged." *Commonwealth* v. *Morgan*, 449 Mass. 343, 349 (2007), quoting from *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). In this context, "circumstantial evidence is competent to establish guilt beyond a reasonable doubt. An inference drawn from circumstantial evidence need only be reasonable and possible; it need not be necessary or inescapable." *Commonwealth* v. *Lodge*, 431 Mass. 461, 465 (2000), quoting from *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998) (quotations and citations omitted).

To prove joint venture, the Commonwealth must prove beyond a reasonable doubt that the defendant was "(1) present at the scene of the crime; (2) with knowledge that another intended to commit the crime or with intent to commit a crime; and (3) by agreement was willing and available to help the other if necessary." *Commonwealth* v. *Berry*, 431 Mass. 326, 330 (2000). See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856 (1997).

We have found no Massachusetts appellate cases involving sex crimes where a defendant was convicted on a joint venture theory absent a common victim, physical presence at the immediate scene, or physical participation in the act. See, e.g., *Commonwealth* v. *Morrow*, 363 Mass. 601, 608 (1973) (adequate factual basis to support the defendant's guilty plea to a rape indictment on a theory of joint venture where he had been physically present when a woman was raped and, as the group left, threw an iron or toaster at the rape victim which struck her in the face); *Commonwealth* v. *Walker*, 68 Mass. App. Ct. 194, 199 (2007) (motion for a required finding of not guilty incorrectly granted where the defendant joint venturer had physically participated in the sexual assault on a common victim).

Our cases are consistent with those from other jurisdictions, which have likewise found joint venture in the context of sex crimes only where there was a common victim and the defendant was physically present at the immediate scene of the crime — in other words, in the physical presence of the victim — or gave active assistance, such as providing the means of escape or deli-

vering the victim to the defendant. See, e.g., the following cases, where the defendants' convictions as joint venturers or accomplices were affirmed: *People* v. *Richardson*, 61 Ill. App. 3d 718, 730-731 (1978) (defendant disconnected telephones in the victim's apartment and guarded the victim's roommate while the victim was being sexually assaulted by the codefendant); *People* v. *Griffin*, 247 Ill. App. 3d 1, 7 (1993), cert. denied, 513 U.S. 1060 (1994) (defendant drove a car while the codefendants sexually assaulted the victim, and helped recapture her after she escaped by driving after her); *State* v. *Greer*, 321 Mo. 589, 594 (1928) (defendant drove the victim to the attacker, and kept the car running in order to provide a ready means of escape while the codefendant sexually assaulted the victim); *Commonwealth* v. *Henderson*, 249 Pa. Super. 472, 483-484 (1977) (defendant told the codefendant "[y]ou can get anything you want" before the codefendant raped the victim); *State* v. *McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982) (defendant stood guard while the attacker was raping the victim, "telling [the attacker] that it looked good and . . . hurry up"); *State* v. *Davis*, 182 W. Va. 482, 485 (1989) (defendant lay on the same bed in which the attacker raped the victim and patted the victim's hand).

In this case, viewed in the light most favorable to the Commonwealth, the evidence was insufficient to support the Commonwealth's theory of joint venture. There was no evidence from which a jury could reasonably infer, let alone any direct evidence of, an agreement between the defendant and Barros that the defendant be "willing and available to help" Barros accomplish his rape of Mary. Once the two boys separated into different bedrooms with the two girls, the evidence showed two separate sexual encounters. The only point of intersection between the two sets of actors during the sexual assaults occurred when the defendant opened the door of the bedroom in which Barros and Mary were located. However, this caused Barros to *stop* raping Mary and thus cannot serve as the basis for joint venture liability on the part of the defendant.

The Commonwealth argues that the fact that the two boys sexually assaulted the girls at the same time was sufficient to prove that the defendant and Barros shared a common intent. However, the issue is not whether there was sufficient evidence to prove

that the defendant shared a common intent to commit simultaneous sexual assaults. Instead, the Commonwealth was required to prove a common intent that Barros rape Mary. In order to prove the defendant guilty as a joint venturer for Barros's statutory rape of Mary, the Commonwealth had to do more than prove that the defendant shared an intent that he and Barros commit independent rapes, out of the physical presence of each other, on two different girls.[1,2]

2. *Force.* The defendant also moved for a required finding of not guilty with respect to the two indictments charging him with the forcible rape of Jane on the ground that there was insufficient evidence of force.[3] We review to determine whether the evidence, viewed most favorably to the Commonwealth, was sufficient to permit the jury to find force. See *Commonwealth* v. *Latimore*, 378 Mass. at 676-677; *Commonwealth* v. *Morgan*, 449 Mass. at 349. The evidence was that Jane was unwillingly "nudged" onto the floor of the closet. Three layers of clothing were removed by the defendant without her assistance. The defendant lay on top of her, and throughout the episode, Jane told him "no" and that she "didn't want to do anything, and [she] wanted nothing to happen." He did not stop when she first asked him to. While intercourse was occurring, Jane was making sounds of crying that were "not good." The evidence of force was sufficient. See *Commonwealth* v. *Eldridge*, 28 Mass. App. Ct. 936, 937 (1990) (evidence of force sufficient based on the victim's testimony and missing buttons from her pajama bottoms).[4]

3. *Jury instructions.* The defendant argues that the judge's

---

[1]Nor does the fact that the defendant and Barros spoke to each other in Portuguese satisfy the Commonwealth's burden. There was no evidence as to the content of those conversations, and any inference as to their content would be sheer speculation. See *Commonwealth* v. *Darnell D.*, 445 Mass. 670, 672 (2005).

[2]Because of our conclusion, we need not reach the defendant's argument that the judge's instruction with respect to the "shared intent" necessary to support a joint venture was inadequate.

[3]This is an issue on appeal only with respect to the first indictment because, on the second, the defendant was convicted of the lesser included offense of statutory rape.

[4]In light of the fact that there was sufficient other evidence of force, we need not and do not reach the Commonwealth's novel theory — raised for the first time at oral argument — that force could be inferred from the fact that the rape occurred in the confined space of a closet.

instructions with respect to force were inadequate in that they left the impression that force was not a separate element of rape. To the contrary, the jury instructions clearly stated that force is a distinct element of rape: *"The second element that the Commonwealth must prove beyond a reasonable doubt* is that the sexual intercourse was accomplished by force or by threat of bodily injury, and against the alleged victim's will" (emphasis added).

4. *Claimed errors occurring during jury deliberations.* The defendant makes two claims of error occurring after the jury had begun their deliberations. First, the defendant argues that the judge "coerced" the jury's guilty verdict of rape when he responded to their question about the effect of being unanimous on a lesser charge but not on the greater charged offense.[5] The question the jury had posed was, "If we are unanimous on the lesser charge, but are not unanimous on the first charge, does our decision revert to the lesser charge or are we hung?" The judge responded:

> "On each indictment, if you conclude unanimously beyond a reasonable doubt that Mr. Parreira is guilty, you have a duty to return a verdict of guilty of the highest crime, up to and including the charged offense of rape of a child by force, that the Commonwealth has proved beyond a reasonable doubt against Mr. Parreira.

> "And you should mark the appropriate box on each verdict slip, either not guilty, guilty of the offense as charged, or guilty of the lesser included offense which reflects your unanimous verdict as to each indictment."

The judge's response made clear to the jury that they had three options with respect to each indictment (not guilty, guilty as charged, or guilty on the lesser included offense) and that the verdict on each indictment was to be unanimous. There was no "coercion" nor any error. That the jury did not find this re-

---

[5]The defendant premises this argument on a claim that the judge "improperly instructed the jury: 'you have a duty to return a verdict of guilty of the highest crime, up to and including the charged offense of rape of a child by force.' " This was only part of the judge's response. The full response is set out in the body of this opinion, *infra.*

sponse to be coercive is clear from subsequent events: after receiving this instruction, the jury resumed deliberations and after some time reported that they were "hopelessly deadlocked on count 1."

Second is defendant's argument that the judge violated G. L. c. 234, § 34, when he gave the so-called *Tuey-Rodriquez* instruction after the jury reported that they were "hopelessly deadlocked on count 1."[6] The timing of a *Tuey-Rodriquez* charge is committed to the discretion of the trial judge. *Commonwealth v. Haley*, 413 Mass. 770, 779 (1992). Here, the jury deliberated for over five hours on a Friday, suspended for the weekend, and resumed on Monday when they deliberated for more than six hours before reporting that they were deadlocked on one of the charges. Without objection, the judge at that point gave the *Tuey-Rodriquez* charge. The jury then resumed deliberations for the rest of the day. They continued deliberating the following morning before returning their verdict. In these circumstances, the defendant has made no showing that use of the *Tuey-Rodriquez* charge was premature or coercive. See *Commonwealth v. Wilson*, 443 Mass. 122, 143 (2004) (no abuse of discretion in delivering a *Tuey-Rodriquez* charge even in the absence of a deadlock where the jury had been deliberating over the course of two days).

The defendant's claim of coercion is also misplaced because it is based on the incorrect claim that the jury had twice reported themselves deadlocked. In fact, the jury only once advised that they were unable to reach a verdict. The jury's other communications with the judge were questions or requests for further explanation that did not constitute reports of deadlock within the meaning of G. L. c. 234, § 34.[7] See *Veiga v. Schochet*, 62 Mass. App. Ct. 440, 444 (2004) (jury question concerning further explanation of the law did not signal a deadlock within the meaning of § 34). See also *Commonwealth v. Valliere*, 366 Mass. 479, 495-496 (1974).

5. *Admission of tape recording.* A tape recording made of the

---

[6]See *Commonwealth v. Tuey*, 8 Cush. 1, 2-3 (1851); *Commonwealth v. Rodriquez*, 364 Mass. 87, 101-102 (1973).

[7]In addition to the question set out earlier in this section, the other question was: "Please define what 'force' means regarding the rape charge, what elements need to have happened, physical force, threat to injure, et cetera, et cetera, what constitutes intimidation, what does constructive force mean?"

police interview of the defendant was admitted in evidence, although not played, during trial. The tape had been produced to the defendant during discovery, and was a recording of his own statements to the police. The defendant did not object to the tape's admission or to it going into the jury room during deliberations. He also did not request that the tape be played during the trial. Relying on *Snyder* v. *Massachusetts*, 291 U.S. 97 (1934), he now contends that his "right to be present during the evidence-taking part of the trial" was violated because the tape was not played during the trial when he could have observed the jury's reaction to it and, based on those observations, made a more informed decision concerning whether to testify.

The fundamental flaw in the defendant's argument is that he was in fact present during the evidence-taking parts of the trial, including when the tape was admitted. Thus, this case does not involve a question of presence. Compare *id.* at 113-114.[8] Furthermore, that the tape was not played in his presence is of no import because nothing prevented the defendant from playing the tape to the jury himself. The defendant knew what the tape contained: it had been produced to him during discovery and it was a recording of his own statement to the police. Armed with that knowledge, he decided to forgo playing the tape during the trial when he would have been able to observe the jury's reaction. He gives no reason or explanation why we should not view his decision as a deliberate one made after balancing the benefits (such as they might have been) of observing the jury against the downside of having the tape played in the court room rather than in the jury room. Cf. *Commonwealth* v. *L'Abbe*, 421 Mass. 262, 269-270 (1995) (defendant can waive the right to be present).

6. *Self-corroborative statements.* The defendant argues that Jane was incorrectly permitted to bolster her testimony concerning the rape by testifying that she told her boyfriend about the incident and that he, as a result, said he wanted to kill the defendant. Because the defendant timely objected, we review for preju-

---

[8]In *Snyder*, the United States Supreme Court rejected the defendant's argument that his constitutional rights were violated when he was excluded from accompanying the jury on a view. *Snyder* v. *Massachusetts*, 291 U.S. at 122. The Court stated that even if "the knowledge derived from an inspection of the scene may be characterized as evidence . . . , a view is not a 'trial' nor any part of a trial . . . ." *Id.* at 113.

dicial error. *Commonwealth* v. *Murungu*, 450 Mass. 441, 447-448 (2008).

Although the defendant objected to this testimony when it was admitted on redirect, he did not do so when testimony regarding the boyfriend's reaction was first elicited on direct examination. Moreover, on cross-examination, the defendant brought forward extensive testimony regarding the identities and number of people whom Jane had told about the incident.[9] This included asking Jane — over the Commonwealth's objection — whether she had told her boyfriend about what had happened and, further, what he said in return. The purpose of these questions was to cast doubt on Jane's credibility; they were part of a line of cross-examination suggesting delay in reporting the incident to a responsible adult, such as a guidance counselor, police officer, doctor, or parent. This line of cross-examination opened the door sufficiently for the Commonwealth to then permissibly return to the topic on redirect.[10] See *Commonwealth* v. *O'Brien*, 35 Mass. App. Ct. 827, 834 (1994) (in cross-examining the witness, defense counsel went beyond the range allowed to the prosecution; the defense thus "opened the door and must abide the consequence that the prosecution could later, on redirect, put questions in the same field"). Where, as here, the defendant's strategy entailed highlighting who the girls told and did not tell about the incident and when they did so, there was no error in permitting the Commonwealth to later elicit testimony on the same topic.

7. *Denial of motion for new trial.* The defendant raised two broad claims in his motion for new trial: prosecutorial misconduct and ineffective assistance of counsel. The trial judge did not abuse his discretion in denying the motion or in doing so without conducting an evidentiary hearing. See *Commonwealth* v. *Walker*, 443 Mass. 213, 224-225 (2005) (denial of a motion for new trial will be upheld absent an abuse of discretion). See

---

[9]Because the defendant pursued this strategy, there is no merit to his suggestion on appeal that the complainants were impermissibly permitted to testify that they had told a number of people about the rapes. Compare *Commonwealth* v. *Stuckich*, 450 Mass. 449, 457 & n.11 (2008).

[10]It was only when the boyfriend's threat to kill the defendant was overheard by his father that news of the assaults reached school officials, the girls' parents, and then the police, the timing of which the defendant had questioned on cross-examination.

also *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995) (whether a motion for new trial requires an evidentiary hearing is left "to the sound discretion of the trial judge").

The defendant first argues that the prosecutor should not have taken the position that the girls were each other's first complaint witness. The defendant contends that, based on the sexual abuse intervention network (SAIN) interviews, the prosecutor "knew" that Jane and Mary had not complained to each other first, but rather to other girlfriends. This argument is supported solely by a distorted reading of the SAIN interview transcripts. Although both girls reported to the SAIN interviewer that they had told someone else "first" about the rapes,[11] those answers were given in the context of having already told the interviewer that they had told each other immediately after the incident. It is clear from the transcripts that the girls interpreted the question of whom they told "first" as asking for the person they first told after they had told each other. There was, accordingly, no misconduct on the part of the prosecutor and, thus, no abuse of discretion in denying the motion for new trial on this basis.

Although the defendant contends that his trial counsel was ineffective for many reasons, his primary claim is that trial counsel failed to impeach the victims with their own cellular telephone records. Jane testified that both girls' cellular telephones were on the kitchen counter in the vacant apartment during the time the rapes were occurring in other rooms. The defendant claimed that the telephone records would have shown that the girls used their telephones continuously throughout the evening and, therefore, the rapes could not have occurred in the manner or during the time period to which they testified. This argument would have some appeal were it actually supported by the telephone records. However, those show two periods when neither of the girls used her telephone.[12] Since neither girl testified to a precise time when they were at the apartment, and both of these time periods were consistent with the general timing to which the

[11]When asked, "[W]ho is the first person that you told about what happened?" Jane said that she told "our friend Kelly." Mary, responding to a similar question, said that she "had told [Barros]'s girlfriend a couple of days later."

[12]Neither girl placed or received a call between 5:36 P.M. and 5:59 P.M., or between 8:08 P.M. and 8:40 P.M.

girls testified, the telephone records offered little, if any, contradiction and the defendant was not deprived of a "substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).[13]

*Conclusion.* In light of the above, the judgments on counts 1 and 2 are affirmed, as is the order denying the motion for new trial. The judgments on counts 3 and 4 are reversed, the verdicts are set aside, and judgment shall enter for the defendant on those counts.

*So ordered.*

---

[13]The defendant's remaining complaints about his counsel relate to supposed failures to object to certain testimony and to counsel's use of the word "incident" to refer to the rapes. As to the latter, we see no error, let alone a problem of any constitutional magnitude. As to the alleged failures to object to testimony, in each instance the testimony was admissible. For example, although the Commonwealth should have waited until redirect examination to elicit testimony regarding Barros's threats to the victims, such testimony was admissible after the defendant's exhaustive questioning on cross-examination about the complainants' delay in reporting the rapes to the authorities. See *Commonwealth* v. *Hall*, 66 Mass. App. Ct. 390, 394 (2006) (after impeachment regarding a reporting delay, a witness may explain why she was silent). Knowing that the focus of his cross-examination would be the delay in reporting, it is likely that defense counsel made a strategic decision not to object to the testimony during the Commonwealth's direct examination. In any event, the testimony would have come in on redirect, even if the defendant had successfully objected to its admission during direct examination.