**David MORGAN, Petitioner**

v.

**Thomas DICKHAUT, Commissioner of Corrections, Respondent.**

**C.A. No. 08–cv–30183–MAP.**

United States District Court, D. Massachusetts.

Jan. 5, 2010.

Catherine J. Hinton, Rankin & Sultan, Boston, MA, for Petitioner.

James J. Arguin, Susanne G. Reardon, Office of the Attorney General, Boston, MA, Amy L. Karangekis, Attorney General's Office, Springfield, MA, for Respondent.

## *MEMORANDUM AND ORDER REGARDING PETITION FOR WRIT OF HABEAS CORPUS (Dkt. No. 1)*

PONSOR, District Judge.

## I. *INTRODUCTION*

Petitioner David Morgan is serving a life sentence in state prison after a jury found him guilty of first degree murder in 2000. He has filed this action pursuant to 28 U.S.C. § 2254, setting out four separate grounds for *habeas* relief. For the reasons set forth below, and despite Petitioner's counsel's vigorous and resourceful arguments, under the narrow standard of review set out in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. 2244 et *seq.,* this court is obliged to dismiss the petition and enter judgment for Respondent.

## II. *BACKGROUND*

### A. *Facts Found in State Court.*

The facts underlying Petitioner's conviction are detailed in the opinion of the Massachusetts Supreme Judicial Court ("SJC"). *Commonwealth v. Morgan,* 449 Mass. 343, 868 N.E.2d 99 (2007). Pursuant to AEDPA, 28 U.S.C. § 2254(e)(1), these factual determinations are presumed to be correct absent clear and convincing evidence to the contrary. *Lynch v. Ficco,* 438 F.3d 35, 39 (1st Cir.2006) (quoting *McCambridge v. Hall,* 303 F.3d 24, 26 (1st Cir.2002) (en banc)). The SJC found that a jury was warranted in finding the following facts.

At the time of his death, the victim, Wayne Rowe ("Rowe"), lived in Springfield, Massachusetts, and was involved in the illegal drug trade, selling marijuana he obtained from Petitioner. Two days prior to his March 3, 1999 disappearance, Rowe's wife, Michelle Rowe ("Michelle"), from whom he was separated, drove Rowe to Petitioner's home where Rowe planned to get marijuana to sell. While seated in the passenger seat of Michelle's car, Rowe was approached by Petitioner who told Rowe that someone had broken into Petitioner's apartment and that anyone in-

volved was "going to feel it." *Morgan*, 868 N.E.2d at 103. On each of the next two days Michelle drove her husband to and from Petitioner's apartment to get more marijuana. Around 5 p.m. on March 3, 1999, Michelle dropped Rowe off at his apartment for the last time.

Later on March 3, Errol Lodge ("Lodge") arrived at Rowe's apartment hoping to purchase marijuana. Lodge too was aware of the break-in at Petitioner's apartment. Petitioner had previously told Lodge about the burglary, that he (Petitioner) knew who had done it and, taking a gun from his waist, that Lodge would "hear about the person." *Id.* at 104.

On March 3, Rowe and Lodge waited together in Rowe's driveway for a delivery of marijuana. Some time later, Petitioner and Floyd Johnson ("Johnson") arrived in a green, four-door sedan. After speaking with the two men, Rowe got into the back seat of the car, which sped away. After waiting a while for the victim to return, Lodge left.

That night Petitioner called Lodge at home and kept him on the phone for two hours, an uncharacteristically long time. During the conversation, Petitioner told Lodge that he had dropped Rowe off "somewhere," that he could not find him, that Rowe's wife had reported him missing, and that "People said I killed him." *Id.* At one point Petitioner told Lodge not to hang up; Petitioner put Lodge on hold for a period of time before resuming the call.

Around 8:30 p.m. that evening, and several times over the next few days, Michelle tried unsuccessfully to contact Rowe by pager. She did not, however, report him missing until March 8, 1999. Rowe's body, still wearing some of the clothing from March 3, was recovered on April 18, 1999, at the edge of the Connecticut River in Agawam, Massachusetts. He had been shot in the head at close range. No murder weapon was recovered, but analysis of the projectile recovered by the medical examiner showed it to be a .38 caliber metal jacket fired from either a .357 Magnum or a limited subset of nine millimeter guns.

After reporting Rowe missing, but before his body was recovered, Michelle confronted Petitioner, asking when he had last seen her husband. Petitioner told her that Rowe had not gotten into the car with him on March 3, 1999. When she later told him that she knew he was lying because someone had seen Rowe get into the car, Petitioner told her to bring the witness to him. When Michelle informed Petitioner that she was going to the police, he responded, "Go to the cops because you can't prove nothing anyways." *Id.*

In June, 1999, both Lodge and Petitioner were arrested and charged with selling marijuana. At that time Petitioner told Lodge, "You cannot become an informant. You only charged for weed and weed is a misdemeanor. I will get you out. Don't tell them nothing. Don't tell them nothing." *Id.* Petitioner paid for a lawyer who visited Lodge in prison three or four times. Lodge, who was subject to a deportation detainer and thus ineligible for bail, remained in jail. While Lodge was in jail, Petitioner kept in contact with Lodge's girlfriend and gave her money. In September 1999, Petitioner failed to meet Lodge's girlfriend to talk about Lodge, after learning that Lodge planned to testify against him.

Petitioner made statements to other individuals implicating him in the murder of Rowe. Prior to Rowe's murder, Petitioner had a conversation with Johnson (the third person in the car on March 3) and Richard McLean ("McLean") in which he said he was going to kill Rowe. Petitioner then

showed McLean a 9mm gun in Johnson's possession. When McLean urged Petitioner to abandon the idea of killing Rowe, Petitioner said that if no one saw him commit the murder, no one could do anything about it and that "[a]s a matter of fact that mother fucker gonna be dead in a week anyway." *Id.* at 105.

McLean and Petitioner met again two days after the victim disappeared. Petitioner wanted to purchase a gun that McLean was holding for Rowe. Petitioner told McLean he needed it because people associated with Rowe were after him and he needed a "clean gun." *Id.* Petitioner told McLean not to worry about giving him Rowe's gun because he would never see Rowe again. At a later date Petitioner told McLean that Rowe was killed with a nine millimeter gun.

In September 1999, McLean spoke with Petitioner at least two more times. During the first conversation Petitioner told McLean that Lodge was going to be providing testimony against him about having seen Rowe get into the car with him and Johnson. After McLean responded, "You guys pick up somebody to kill him and somebody there seen, and you guys still do it? You guys got to be stupid." *Id.* In response, Petitioner laughed. During the second conversation, Petitioner told McLean that he was feeling "fucked up" because he had learned that Rowe had *not* broken into his apartment and that Rowe had "died for the wrong reason." *Id.*

Another witness, Warren Smith ("Smith"), testified that he had been present when Petitioner, who then owed Rowe marijuana, waved a .45 caliber gun around and said that if anyone, including Rowe, tried to rob him, he would kill the person. After the murder Petitioner bragged to Smith that he had shot at a person who owed him money for marijuana. In addition to the .45 caliber handgun, Smith had seen Petitioner with a .357 Magnum and a nine millimeter German Luger.

Finally, Petitioner told a fellow inmate that he was charged with a murder but was going to "bring it to trial to try to beat it." *Id.* In a statement to police, Petitioner also claimed that the victim could not be trusted because he would "rob you." *Id.* at 104.

## B. *Procedural History.*

Petitioner was indicted by a Hampden County grand jury on November 19, 1999, for Rowe's murder.[1] His trial began on October 30, 2000. Significantly, the Commonwealth at trial chose to proceed solely on a theory of principal liability, *i.e.,* that Petitioner was the actual shooter, and not on a theory of joint venture with Johnson. The jury convicted Petitioner of first degree murder by deliberate premeditation on November 17, 2000. Petitioner filed a timely notice of appeal, and on February 20, 2004, he filed a motion for a new trial. Following a two-day evidentiary hearing, Petitioner's motion for a new trial was denied by the trial judge on December 23, 2005. Petitioner timely appealed, and his two appeals were consolidated. On June 15, 2007, the SJC affirmed both Petitioner's conviction and the denial of Petitioner's motion for new trial. Petitioner filed his Petition for Writ of *Habeas* Corpus on

---

1. Petitioner was also indicted for conspiracy to murder another person. At the close of the Commonwealth's case the judge entered a verdict of not guilty on that charge. Two other individuals were indicted with Petitioner: Floyd Johnson and Julian Thompson. Johnson and Petitioner were to be tried together. During jury selection the trial judge granted Johnson's motion to sever his case, and the Commonwealth later filed a *nolle prosequi* as to Johnson on December 12, 2001. Julian Thompson died before his separate trial, scheduled during 2001.

September 10, 2008, after the time expired for him to petition for certiorari in the United States Supreme Court.

### 1. *Petitioner's Trial.*

Prior to opening arguments the Commonwealth successfully moved to join the indictment charging Rowe's murder with another indictment charging Petitioner with participating in a conspiracy to murder another individual, Tanashe Edwards ("Edwards"). The prosecution believed that Petitioner conspired with others to kill Edwards after learning that Edwards, not Rowe, had broken into Petitioner's apartment. The prosecution asserted that statements made in the course of the conspiracy about the killing of the wrong man connected that crime to Rowe's murder.

From the beginning it was unclear whether the prosecution would be able to present enough evidence of the conspiracy for that claim to go before the jury. Recognizing this, the trial judge directed the prosecutor to avoid references in his opening statement to evidence that might ultimately be inadmissible. The trial judge limited the prosecutor to general references to an alleged meeting between Petitioner and the other conspirators.

In his opening statement the prosecutor referenced the meeting and indicated that Rowe had been killed because Petitioner mistakenly thought Rowe had robbed him. Following the opening statement Petitioner's attorney moved for a mistrial asserting that the prosecutor had gone beyond the limits set by the judge by referencing specific statements by members of the alleged conspiracy to kill Edwards. The trial judge denied the motion, though he later instructed the jury not to consider statements related to an alleged conspiracy made during opening argument. Peti-

tioner's attorney failed to renew this motion at the close of the prosecution's case.

During the trial a state trooper testified that the gun used to kill Rowe was capable of firing .38 caliber ammunition and had a rifling system with five lands and grooves with a right twist.[2] He further stated that such characteristics were consistent with either a nine millimeter pistol or a .357 Magnum handgun. Although Petitioner's attorney had hired a firearms expert who would have testified that fewer than ten percent of nine millimeter pistols have the type of rifling system identified by the state trooper, she neither called that expert nor asked the state trooper about whether the murder weapon was more likely a nine millimeter pistol or a .357 Magnum.

### 2. *The Motion for a New Trial.*

While his direct appeal was pending, Petitioner moved for a new trial raising a number of issues, only some of which are relevant here. He claimed that: (1) the portion of the prosecutor's opening referring to the Edwards conspiracy deprived him of a fair trial; (2) his attorney's failure to elicit testimony about the likelihood that the murder weapon was a nine millimeter firearm and her failure to put on an exculpatory witness, constituted ineffective assistance of counsel; and (3) newly discovered evidence about McLean's deportation history warranted a new trial because Petitioner was materially prejudiced by his inability to impeach McLean at his first trial.

In considering Petitioner's new trial motion, the trial judge held two days of evidentiary hearings at which he took testimony regarding the exculpatory witness not presented by Plaintiff's attorney and

---

**2.** "Lands and grooves" is a term used by firearms examiners to describe the negative impressions borne by a projectile that has been fired through a rifled barrel.

the newly discovered evidence related to McLean. Petitioner showed that the witness not called by Petitioner's attorney was one Katie Wells ("Wells"). If called and permitted to testify Wells would have said that an individual named Howard Livingston ("Livingston") had confessed to her that he killed Rowe. At the hearing, Wells testified that shortly after meeting Livingston, whom she knew as Mike, Livingston told her she would not see Rowe anymore because he had shot Rowe in the head and thrown him into the river "for the fish to eat." *Id.* at 109, n. 8. When Rowe's body was subsequently found by the river, Wells went to the police, gave two statements regarding what Livingston had told her, and identified Livingston in a police line-up. The police then questioned Livingston, who indicated that the victim could have been killed for "any number of reasons," had not been "a pillar of the community," and was not missed. Petitioner's trial counsel testified at the hearing that she had subpoenaed both Wells and Livingston, but neither appeared for the trial. Wells did not appear because the subpoena was served at an old address, despite the fact that her current address could have been obtained because she was on probation.

On the issue of newly discovered evidence, Petitioner offered evidence showing that Richard McLean, a key prosecution witness, had been deported twice and at the time of the trial was subject to criminal penalties for illegally reentering the United States. Without specific knowledge of his past deportations, Petitioner's trial attorney had tried to ask McLean whether he had ever been deported. She had sought information about penalties McLean faced related to illegal re-entry that

might be a basis for favoring the prosecution in his testimony. However, the trial judge sustained an objection by the prosecution, preventing Petitioner's attorney from asking McLean about past deportations. Petitioner argued that he was entitled to a new trial during which he could ask whether McLean hoped to receive more favorable treatment related to his immigration problems if he testified for the government.

Following the hearing, the trial judge denied Petitioner's motion for new trial. As to Petitioner's claim that he had received inadequate representation, he determined that trial counsel's failure to call Wells was harmless as Livingston's statements were uncorroborated and inadmissible hearsay. Moreover, he found that Petitioner's attorney's failure to elicit testimony about the relative rarity of a nine millimeter gun with a rifling system consistent with that of the murder weapon did not meet the relevant standard for ineffective assistance of counsel entitling a defendant to a new trial because that evidence was consistent with the Commonwealth's theory of the case.

The trial judge also rejected Petitioner's claim that prosecutorial misconduct during its opening statement warranted a new trial. He concluded that the prosecution had acted in good faith, did not commit prosecutorial misconduct, and that the judge's instructions to the jury mitigated any unfair prejudice that might otherwise have resulted.

Petitioner's claim that newly discovered evidence of penalties McLean faced for illegally entering the United States warranted a new trial was also rejected.[3] The

---

**3.** The trial judge also considered whether newly discovered evidence that another government witness, Warren Smith, had given perjured testimony warranted a new trial.

He ultimately concluded that the witness testified truthfully. Petitioner has not presented any arguments based on the testimony of this witness here.

trial judge concluded that the prosecution had provided Petitioner with all of the information it had regarding McLean's criminal record and that even without the deportation information Petitioner's attorney had done such an excellent job impeaching McLean that the newly discovered evidence would not have influenced the jury.

### 3. The SJC Opinion.

The SJC reviewed both Petitioner's conviction and the denial of his motion for a new trial. After reciting the facts a jury could have found from the trial evidence, the SJC discussed the sufficiency of the evidence and, in the context of the new trial motion, the asserted attorney errors, the prosecutor's opening, the significance of the McLean deportation evidence, and two other issues not presented to this court. In its review, the SJC addressed Petitioner's argument that the evidence was insufficient to prove that the Petitioner, not Floyd Johnson, was the one who actually murdered the victim.[4] Johnson had been seen in the green sedan with Petitioner and the victim Rowe the last time Rowe had been seen alive on March 3, 1999.

In rejecting this contention, the SJC noted the evidence pointing to Petitioner. Petitioner's apartment, not Johnson's, had been robbed; Petitioner had told Lodge that he knew who had robbed him and, while waving a gun, had said Lodge would hear more about the person; and Petitioner had made statements indicating both that he thought Rowe had robbed him and, later, that he felt bad because Rowe had "died for the wrong reason." Additionally, Petitioner had been seen with both a nine millimeter gun and a .357 Magnum, either of which might have been the murder weapon. And, perhaps most importantly, the jury could have inferred that Petitioner was the shooter based on his communications with Lodge beginning the night the victim was last seen. When speaking with Lodge that night, Petitioner placed himself in the role of killer, saying that "people" thought he had murdered the victim, even though at that time no one, not even the victim's wife Michelle, knew that Rowe was missing. Later Petitioner took steps to try to ingratiate himself with Lodge and to keep Lodge from becoming an informant. Taken together, the SJC concluded that this evidence was sufficient to allow a reasonable jury to conclude that Petitioner had pulled the trigger.

The SJC also affirmed the denial of the motion for a new trial, agreeing with much of the reasoning of the trial judge. The court reiterated that Petitioner's attorney's failure to call Wells was unlikely to have caused a miscarriage of justice because most of her testimony would have been inadmissible. Similarly, the SJC agreed that the absence of testimony about the relative rarity of nine millimeter guns with rifling systems matching the murder weapon did not prejudice Petitioner because such testimony was not inconsistent with the prosecution's theory that the murder weapon was either the nine millimeter gun or the .357 Magnum Petitioner was seen with before the murder. As to the alleged prosecutorial misconduct, the SJC deferred to the trial judge's conclusion that the prosecutor had not acted in bad faith. Moreover, the prosecutor's statements related to the conspiracy did not go to the core of the Commonwealth's case,

---

4. As noted, this argument was strengthened by the fact that the Commonwealth had chosen to proceed solely on a theory of *principal* liability, *i.e.*, that Petitioner was the one that actually shot Rowe. The jury was not instructed on joint venture liability and was not permitted to convict Petitioner on that theory.

but simply supported the prosecution's theory about Petitioner's motive for killing the victim. To the extent that the prosecutor's opening could have prejudiced Petitioner, the SJC agreed that the trial judge's instructions to the jury before the openings, immediately after the openings, prior to closings, and in his final instructions were sufficiently curative.

Finally, the SJC agreed that the post-trial discovery that McLean had been deported twice and faced criminal sanctions for illegal re-entry did not warrant a new trial. The SJC did not address whether Petitioner's right to confront the witnesses against him had been violated when the trial judge prevented Petitioner's attorney from questioning McLean about past deportations. Instead it simply noted that the deportation evidence would have been used to impeach McLean and that, as noted by the trial judge, Petitioner's attorney had done an thorough job of impeaching the witness, even without information about the deportations.

### 4. *Petitioner's § 2254 Petition.*

Following the SJC's decision affirming the murder conviction and denial of Petitioner's motion for a new trial, Petitioner filed a petition for *habeas corpus* in this court in which he argues: (1) that the evidence at trial was insufficient to support his murder conviction on a principal liability theory; (2) that he received ineffective assistance of counsel; (3) that prosecutorial misconduct deprived him of a fair trial; and (4) that restrictions placed on his cross-examination of a witness deprived him of the right to confront witnesses against him.

### III. *The AEDPA Standard*

■ Under the now-familiar standard of review set out in AEDPA, this court may only grant a state prisoner's petition for *habeas corpus* if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established federal law if it (1) applies "a legal rule that contradicts the rule established by Supreme Court precedent" or, (2) "reaches a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent." *Malone v. Clarke*, 536 F.3d 54, 62 (1st Cir.2008) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

■ A state court's decision unreasonably applies federal law as established by the Supreme Court if it either: (1) "identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case" or (2) unreasonably extends or refuses to extend a legal principle to a new context. *Dagley v. Russo*, 540 F.3d 8, 13 (1st Cir. Mass.2008) (citing *Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (alteration in original). To merit deferential review under AEDPA, a state court need not cite (or even be aware of) Supreme Court precedent so long as its decision on the merits is not contrary to the Supreme Court's interpretation of federal law. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). This court may review a claim *de novo* only when the state court has failed to address a constitutional claim properly raised by the petitioner. *Watkins v. Murphy*, 292 F.3d 70, 75–76 (1st Cir.2002).

### IV. *DISCUSSION*

#### A. *Sufficiency of the Evidence.*

■ Petitioner's first ground for relief is that the evidence introduced at trial was insufficient to establish that he was guilty

of first degree murder on a theory of principal liability. When reviewing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).[5] The essential elements of the crime are established by state law. *Id.* at 324 n. 16, 99 S.Ct. 2781.

Here, Petitioner was convicted of first degree murder, which Massachusetts defines in pertinent part as "[m]urder committed with deliberately premeditated malice aforethought...." Mass. Gen. Laws ch. 265, § 1. Because the government did not pursue a joint venture theory and the jury was not instructed on joint venture liability, it also had the burden of showing beyond a reasonable doubt that Petitioner himself actually pulled the trigger. *Torres v. Dennehy*, 603 F.Supp.2d 264, 270 (D.Mass.2009) (quoting *Commonwealth v. Torres*, 442 Mass. 554, 813 N.E.2d 1261, 1270 (2004)). *See also United States v. Ayala*, 289 F.3d 16, 25 (1st Cir.2002) ("Identification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt.") (quotation marks and citations omitted).

Petitioner contests the sufficiency of the evidence only as to the identification element: that it was he, not Johnson, who actually killed Rowe.[6] Petitioner argues

that the SJC's sufficiency determination on this point applied a standard contrary to *Jackson*, and, in the alternative, that it unreasonably applied the *Jackson* standard to the facts in this case. For reasons stated below, this court disagrees.

1. *"Contrary to."*

Petitioner's contention that the SJC applied a test contrary to that established in *Jackson* and its progeny seizes upon the SJC's finding that evidence "point[ed] more strongly in the direction of [Petitioner's] culpability as the perpetrator such that a jury could reasonably infer that the defendant was the shooter beyond a reasonable doubt." *Morgan*, 868 N.E.2d at 107. Petitioner argues that the court's use of the phrase "point[ed] more strongly" demonstrates that it applied a mere preponderance standard rather than the beyond a reasonable doubt standard required by *Jackson*.

The second half of the sentence Petitioner quotes belies his position. The SJC did not merely determine that there was *more* evidence suggesting Petitioner, not Johnson (or some third party), pulled the trigger; rather it determined that there was enough evidence pointing to Petitioner "that a jury could reasonably infer that the defendant was the shooter *beyond a reasonable doubt.*" *Id.* (emphasis added). The SJC's use of the "point more strongly" language was a means of distinguishing this case from *Commonwealth v. Salemme*, 395 Mass. 594, 481 N.E.2d 471 (1985), in which it had determined that

---

5. While the SJC's decision never cites to *Jackson* in analyzing Petitioner's sufficiency of the evidence claim, it relies upon a series of analogous Massachusetts cases that adopt the governing federal constitutional standard and thus effectively addresses the federal constitutional question raised. *See Leftwich v. Maloney*, 532 F.3d 20, 24 (1st Cir.2008).

6. Petitioner concedes that the Commonwealth's evidence would be sufficient to support a conviction for first degree murder on a theory of joint venture. (Dkt. No. 3, Mem. Of Law in Supp. of Pet. For Writ of Habeas Corpus at 36.)

when the available evidence supported an *equal* likelihood that either of two individuals could have shot a victim, the guilt of neither can be said to have been established beyond a reasonable doubt. *Id.* at 476. The court concluded that here, unlike in *Salemme,* the evidence was not in equipoise but pointed toward Petitioner such that a jury could reasonably infer that the defendant was the shooter beyond a reasonable doubt. The court thus applied the appropriate standard under *Jackson* and its decision was not "contrary to" clearly established federal law.

### 2. *"Unreasonable application of."*

■ "Once a state court has passed upon the merits of a sufficiency challenge in accordance with the appropriate federal constitutional standard, a federal habeas court's review becomes incrementally more nuanced." *Leftwich v. Maloney,* 532 F.3d 20, 23 (1st Cir.2008). Where a petitioner challenges a state court ruling under the "unreasonable application" prong of § 2254(d)(1), the decision " 'must be shown to be not only erroneous, but objectively unreasonable.' " *Waddington v. Sarausad,* — U.S. ——, 129 S.Ct. 823, 831, 172 L.Ed.2d 532 (2009) (quoting *Middleton v. McNeil,* 541 U.S. 433, 436, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004)). The relevant question is not whether this court would have arrived at the same judgment or conclusion as the state court in the first instance, *O'Laughlin v. O'Brien,* 568 F.3d 287, 304 (1st Cir.2009); *Stephens v. Hall,* 294 F.3d 210, 225 (1st Cir.2002); *Bui v. DiPaolo,* 170 F.3d 232, 242 (1st Cir.1999), but whether the state court's decision "evince[d] some increment of incorrectness beyond mere error." *Leftwich,* 532 F.3d at 23, citing *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir.2002) (en banc).

In asserting that the SJC's sufficiency ruling was objectively unreasonable, Peti-

tioner argues that the Commonwealth's largely circumstantial evidence was "utterly insufficient" to permit any rational trier of fact to identify him as the shooter beyond a reasonable doubt. (Dkt. No. 3, Mem. Of Law in Supp. of Pet. for writ of Habeas Corpus at 36.) Petitioner contends that as to the limited question of who was the actual shooter, all of the evidence pointing to him points nearly equally at Johnson, and that therefore any rational juror must necessarily have entertained a reasonable doubt.

In assessing Petitioner's claim, the court finds instructive the First Circuit's recent opinion in *O'Laughlin v. O'Brien,* 568 F.3d 287 (1st Cir.2009). Like the instant case, *O'Laughlin* involved a challenge to the sufficiency of circumstantial evidence to support a conviction. In its explication of the governing law, the court noted the unique and inherent difficulty in applying the *Jackson* standard in such cases. It observed that where a conviction is bottomed on circumstantial evidence alone, "[a court] face[s] head-on the disturbing truth that guilty verdicts rest on judgments about probabilities and those judgments are usually intuitive rather than scientific.' " *Id.* at 300–1 (quoting *Stewart v. Coalter,* 48 F.3d 610, 614 (1st Cir.1995)).

■ While noting that "[g]uilt beyond a reasonable doubt cannot be premised on pure conjecture" the court continued, "a conjecture *consistent with the evidence* becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." *O'Laughlin,* 568 F.3d at 301 (emphasis added) (quoting *Stewart,* 48 F.3d at 615–16). Thus, while a reviewing court should be "loath to stack inference upon inference in order to uphold the jury's verdict," *Id.* (quoting *United States v. Valerio,* 48 F.3d 58, 64 (1st Cir.1995)), so long as the total evidence permits a conclu-

sion of guilt beyond a reasonable doubt, it "need not exclude every reasonable hypothesis of innocence" *Id.* (quoting *United States v. Brown*, 603 F.2d 1022, 1025 (1st Cir.1979)). *Cf. United States v. Thornley*, 707 F.2d 622, 625 (1st Cir.1983) ("The trier of fact is free to choose among various reasonable constructions of the evidence").

In *O'Laughlin*, the defendant was convicted of several charges related to the brutal beating of Annmarie Kotowski. At the time of the assault, which took place in the victim's bedroom in the middle of the night, Kotowski had recently separated from her husband of over twenty-five years. Her upstairs neighbor called the police after he woke to the sound of her screams and "wood hitting wood." *Id.* at 291. Police responded to the call and interacted with defendant who told them he too had heard screaming, but believed it to be a raccoon. The officers found defendant to be "uneasy and distant" but, finding nothing suspicious, left the complex. *Id.* The victim's boyfriend found her when he arrived for a morning coffee almost four hours later.

There were no signs of a forced entry, nothing of value was taken, and, with the exception of the bedroom, Kotowski's apartment was neat and tidy. The defendant was one of several maintenance staff who had a key to Kotowski's apartment. He lived two doors down from her and had previously made repairs in her apartment. Prior to the attack he had made comments indicating that he found Kotowski to be attractive and perceived her to be wealthy. O'Laughlin had a history of drug use and on the night of the attack he had tried unsuccessfully to obtain drugs due to a lack of money.

The SJC had held that this circumstantial evidence "permissibly convinced the jury of the defendant's guilt" and affirmed O'Laughlin's convictions. *Commonwealth v. O'Laughlin*, 446 Mass. 188, 843 N.E.2d 617, 627 (2006) (reversing the Massachusetts Appeals Court who had concluded that the evidence was insufficient). As the SJC saw it, the jury could have permissibly found that Kotowski's assault was financially motivated. It reasoned that O'Laughlin's drug use and his inability to raise money for drugs on the day of the attack, coupled with statements that he perceived the victim to be wealthy, allowed the jury to reasonably infer that he had attempted to rob her. As to why nothing of value had been taken, the SJC concluded that the evidence allowed the further inference that O'Laughlin fled in fear when had heard the upstairs neighbor make a phone call. The SJC observed that the proximity of O'Laughlin's residence and his access to a master key provided him with the opportunity to commit the crime. As to means, the SJC observed that police had found a metal baseball bat in the woods near the complex that jurors would have been warranted in concluding belonged to O'Laughlin.[7] Finally, the SJC noted that the defendant's "uneasy and distant" demeanor when speaking with the police shortly after the attack, his later reluctance to go to the police station, his reluctance to allow police to swab his closet door, and his apparently indifferent reaction when he later learned of the attack, all reflected O'Laughlin's consciousness of guilt. In sum, the SJC found that the evidence on balance "was sufficient to permit the jury to determine beyond a reasonable doubt that the defendant was the perpetrator of the vicious attack on the victim." *Id.* at 628.

---

**7.** The Court acknowledged the lack of evidence tying the aluminum bat to the crime scene, as well as O'Laughlin's statement that he had not seen it since moving in to the complex.

A judge of this district subsequently dismissed the defendants petition for *habeas corpus* relief, but on appeal the First Circuit reversed, holding that the SJC's decision was an unreasonable application of *Jackson* and its progeny. Particularly troubling to the Court of Appeals were the many discrepancies between the prosecution's theory of the case and the record evidence. The court found that the evidence suggesting a financial motive was greatly weakened by evidence that nothing, not even expensive items in plain view, had been taken from the victim's apartment. As to the SJC's curative explanation that the assailant may have been frightened off by sounds from the upstairs neighbor, the Court found that no rational juror could have drawn such an inference given the volume and duration of Kotowski's screams. Additionally, the savagery of the attack, involving nearly twenty blows and resulting in every bone in the victim's face and skull being broken, was *itself* inconsistent with a financial motive. Finally, the aluminum bat, which jurors permissively could have concluded belonged to O'Laughlin and was "consistent" with the victim's injuries, was not only a common item in a residential complex but also inconsistent with the neighbor's description of the sounds of the attack as "wood hitting wood."

Given the discrepancies between the government's theory of the case and the record evidence, as well as the relative weakness of the "consciousness of guilt" evidence, the court concluded that the jury in *O'Laughlin* would have had to make impermissible leaps of speculation to conclude that O'Laughlin was the assailant beyond a reasonable doubt and the SJC's decision to uphold O'Laughlin's conviction was objectively unreasonable.[8]

Petitioner urges the court to find his case indistinguishable from *O'Laughlin,* and likewise to find that the SJC's decision upholding his conviction was objectively unreasonable. However, while a number of similarities may exist between the two cases, the evidence of Petitioner's guilt, though circumstantial, suffers none of the defects that so concerned the First Circuit in *O'Laughlin.*

Here, the Commonwealth argued that Petitioner killed the victim in retribution for the burglary of his apartment. This motive was corroborated by other evidence, including Petitioner's own statement to police that the victim could not be trusted and would "rob you." *Morgan,* 868 N.E.2d 99, 104. Unlike in *O'Laughlin,* no evidence undermined the proffered theory of motive. In addition to having strong record support, the theory here points much more strongly toward Petitioner as the shooter. As the SJC observed, it was Petitioner's, not Johnson's apartment that had been robbed; it was Petitioner who told Lodge that he knew who had robbed him and, while waving a gun, had said Lodge would hear more about the person; and it was Petitioner who made statements indicating both that he thought Rowe had robbed him and, later, that he felt bad because Rowe had "died for the wrong reason."

Undaunted by these facts, Petitioner suggests an equal animus toward the vic-

---

**8.** These discrepancies were especially troubling in *O'Laughlin* in light of significant, credible evidence that suggested that the assailant was in fact the victim's estranged husband. While not critical or even necessary to this court's analysis of Petitioner's claim, it is difficult not to contrast *O'Laughlin* from the situation here, where Petitioner's alternate hypothesis of the evidence is not innocence of any involvement in the murder of Rowe, but rather that Petitioner may not have been the person who actually pulled the trigger when Rowe was fatally shot.

tim may be imputed to Johnson because, based on Johnson's involvement with Petitioner in the drug trade, a theft of drugs and money might constitute a sideways threat to Johnson's business interests as well. Assuming without deciding that such a conclusion would not be unreasonable, the fact that the jury could have (but did not) reach it does not render the evidence insufficient. *United States v. Dwinells,* 508 F.3d 63, 74 (1st Cir.2007); *United States v. Thornley,* 707 F.2d 622, 625 (1st Cir.1983) ("The trier of fact is free to choose among various reasonable constructions of the evidence").

Additionally, Petitioner had been seen with both a nine millimeter gun and a .357 Magnum, either of which might have been the murder weapon. It was uncontroverted in this case that the victim was killed by a projectile with a .38 caliber casing fired from one of two types of guns with a particular type of rifling system—either a .357 Magnum or a small minority of nine millimeter guns. This evidence relating to the murder weapon was stronger than in *O'Laughlin.* There the alleged murder weapon, a metal baseball bat, was consistent with the injuries inflicted on the victim but inconsistent with the upstairs neighbor's report of hearing "wood hitting wood."

Perhaps most importantly, the jury could have inferred that Petitioner was the shooter based on his communications with Lodge beginning the night the victim was last seen. When speaking with Lodge that night, Petitioner placed himself in the role of killer, saying that "people" thought he had murdered the victim, even though at that time no one, not even the victim's wife Michelle, knew that Rowe was missing. Later Petitioner took steps to try to ingratiate himself with Lodge and to keep Lodge from becoming an informant. Petitioner's inculpatory statements provided far stronger evidence of guilt than the "consciousness of guilt" evidence in *O'Laughlin.*[9] Finally, Petitioner's statements to Richard McLean that he planned to kill the victim and later that he had carried out his plan directly point to Petitioner, not Johnson.

The evidence the government relied on to prosecute Petitioner as a principal was far from overwhelming here. However, the SJC's conclusion did not require (as was the case in *O'Laughlin*) "[the] stack[ing of] inference upon inference" in order to overcome inconsistencies with the record evidence. *See O'Laughlin,* 568 F.3d at 301. It is unavoidable that Johnson's presence in the car, his possession of a nine millimeter gun, and the fact that he was an drug associate of Petitioner might suggest the possibility the Johnson could have pulled the trigger. However, a jury need not exclude every alternate hypothesis in order to find a defendant guilty beyond a reasonable doubt. *Stewart v. Coalter,* 48 F.3d 610, 616 (1st Cir.1995). See *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985) (Breyer, J.) ("... the jury is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable."). A jury which credited the testimony regarding Petitioner's own incriminating statements and behavior could

---

9. As the First Circuit noted in that case, the behavior of Petitioner when the police investigated the neighbor's call, later identified by police as suspicious, was not deemed suspicious enough at the time to warrant further investigation of the condominium complex. His other behaviors, such as reluctance to go to the police station and agitation during his police interview, while possibly indicative of consciousness of guilt related to some crime, such as possession of illegal drugs, were an insufficient basis from which to conclude he was guilty of the brutal attack.

rationally conclude that there was no reasonable doubt that Petitioner, not Johnson, shot Rowe. The SJC's conclusion that a rational trier of fact could have determined beyond a reasonable doubt that Petitioner was the shooter, was not objectively unreasonable.[10] *Leftwich,* 532 F.3d at 23 citing *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir.2002) (en banc).

### B. *Ineffective Assistance of Counsel.*

 Petitioner's second claim is that he was deprived of the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. To prevail on this claim, a petitioner must show that: 1) counsel's performance was deficient, and 2) the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[11] The element of deficiency requires "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The element of prejudice requires "that there [be] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052. While Petitioner must ultimately prove both prongs to prevail, "a reviewing court need not address both requirements if the evidence as to either is lacking." *Sleeper v. Spencer,* 510 F.3d 32, 38–40 (1st Cir.2007) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed"). That is the course this court will follow in reviewing the three errors Petitioner alleges related to his representation at trial.

### 1. *Failure to Call an Exculpatory Witness.*

 Petitioner attributes error to defense counsel's failure to find and call Katie Wells as a witness. If called and permitted to testify, Wells would have testified (or at least attempted to testify) that another man, Livingston, confessed to her that he killed the victim. The SJC found that the failure to call Wells as a witness did not prejudice the defense because the statement she might have offered would have been inadmissible as hearsay and therefore barred by the trial judge. The court determined that Livingston's statement contained insufficient indicia of reliability to be excepted from the hearsay rule as a statement against penal interest, *see Commonwealth v. Drew,* 397 Mass. 65, 489 N.E.2d 1233, 1239 (1986), or under principles of due process as described by the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). On review, this court concludes that the SJC was not objectively unreasonable in finding

---

**10.** Consonant with the restrictive standards laid out by Congress in AEDPA, this court offers no opinion as to whether it would itself necessarily have arrived at the same judgment as the SJC in the first instance. *See Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Creighton v. Hall,* 310 F.3d 221, 226 (1st Cir.2002). While the facts presented are close and somewhat troubling, the SJC's conclusion does not evince an incorrectness beyond error justifying reversal under AEDPA. *Leftwich,* 532 F.3d at 23. These same facts do, however, make the Commonwealth's decision to forego an alternative joint venture theory inexplicable.

**11.** The SJC did not specifically mention the *Strickland* standard, applying instead the state analog stated in *Commonwealth v. Saferian,* 366 Mass. 89, 315 N.E.2d 878, 883 (1974). As the Court of Appeals in this circuit has observed, "for habeas purposes, *Saferian* is a functional equivalent of *Strickland,*" *Ouber v. Guarino,* 293 F.3d 19, 32 (1st Cir.2002). Thus, this court analyzes the SJC's decision as having applied federal law under AEDPA.

that Wells' absence did not prejudice the defense.

In *Chambers v. Mississippi*, the Supreme Court held that when a hearsay statement bearing persuasive assurances of trustworthiness is critical to the defense, due process prohibits exclusion of that statement through a "mechanistic" application of the hearsay rules. 410 U.S. at 302, 93 S.Ct. 1038. Petitioner argues that under *Chambers* the timing and substance of Livingston's alleged statement, given before the discovery of the victim's body and accurately reflecting the manner of the victim's death, provided the requisite "persuasive assurances of trustworthiness," such that exclusion of Wells' testimony, if it had been offered, would have violated due process.

Comparing the assurances Petitioner cites to those presented in *Chambers*, however, Petitioner's argument quickly loses traction. In *Chambers*, each proffered statement was made spontaneously to a close acquaintance. *Id.* at 300, 93 S.Ct. 1038. Each statement was individually corroborated by some other evidence in the record, including a sworn confession by the declarant and testimony by eyewitnesses. Moreover, "[t]he sheer number of independent confessions provided additional corroboration for each." *Id.* Petitioner correctly points out that the factors considered in *Chambers* are not absolute. The First Circuit, however, has observed that in any case "less powerful than *Chambers*, a defendant whose proffer of evidence was rejected for any conventionally plausible reason or rule usually has an uphill struggle." *Fortini v. Murphy*, 257 F.3d 39, 46 (1st Cir.2001) (noting that *Chambers* "can be invoked only in extreme cases"). The defendant has not shown that his case

presents the type of rare and unique circumstances in which the exclusion of evidence under the hearsay rule would have defeated the ends of justice and thereby violated the due process clause.[12]

Similarly, the lack of "corroborating circumstances clearly indicat[ing] the trustworthiness of [Livingston's] statement" made it inadmissible as a statement against penal interest. See *Drew*, 489 N.E.2d at 1240 (where "[a] statement [is] offered to exculpate the accused, [it] must be corroborated by circumstances clearly indicating its trustworthiness"). Because Wells' statement, even if offered, would have been inadmissible, the SJC's conclusion that defense counsel's failure to call Wells as a witness did not prejudice the defense was not objectively unreasonable.

2. *Failure to Impeach Government Ballistics Evidence.*

■ Petitioner's second argument is that defense counsel's failure to cross-examine a prosecution firearms witness or to put on a firearms expert of her own, denied him a substantial ground of defense. Ballistics tests had established that the bullet that killed the victim was fired from a gun with a rifling system with five lands and grooves with a right twist. Such a rifling system was consistent with either a 9 mm pistol or a .357 Magnum handgun. If called, Petitioner's firearms expert would have testified that less than ten percent of the weapons with that rifling system are 9 mm. This testimony also could have been elicited through the cross-examination of one of the prosecution's witnesses.

The prosecution's dominant theory of the case was that Petitioner used a 9 mm

---

**12.** Moreover, Petitioner has not shown that either the trial court or the SJC applied the hearsay rule "mechanistically." Rather, each merely concluded that there were insufficient indications of trustworthiness to allow Livingston's statement into evidence through Wells.

pistol to kill the victim, but it also presented evidence that he also had access to a .357 magnum. The SJC concluded that because testimony about the prevalence of 9 mm pistols with the particular rifling system would not have foreclosed the possibility that the murder weapon was a 9 mm, and because there was evidence that Petitioner also had access to a .357 handgun, any error on the part of counsel was harmless in this case. The SJC's conclusion that Petitioner failed to show his case was prejudiced by defense counsel's omission had strong record support and was not objectively unreasonable under *Strickland.*

3. *Failure to Renew a Request for a Mistrial.*

The third error Petitioner ascribes to his trial counsel is her failure to renew a request for a mistrial based on an allegedly improper opening statement by the prosecution. For reasons discussed below in connection with Petitioner's claims of prosecutorial misconduct, this court concludes that in the context of the entire argument and in light of the judge's instructions to the jury, Petitioner was not prejudiced by the prosecutor's opening statement. Accordingly, the SJC did not unreasonably apply the *Strickland* standard in determining that Petitioner was not prejudiced by his counsel's failure to renew a request for a mistrial.

C. *Prosecutorial Misconduct.*

 Relying on the Supreme Court's decision in *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), Petitioner's third claim is that the prosecutor's reference in his opening to certain statements by an alleged coconspirator contributed to a violation of Petitioner's due process rights under the Fourteenth Amendment. As noted above,

prior to opening statements, Petitioner's indictment charging Rowe's murder had been joined with another charging him with participation in a conspiracy to murder an individual named Edwards. The prosecution's belief was that the conspiracy to kill Edwards arose after it was learned that Edwards, not Rowe, had been responsible for the break-in at Petitioner's apartment. The prosecutor asserted that statements made in the course of the alleged Edwards conspiracy, that the wrong man had previously been killed, connected that crime to Rowe's murder. Because it was unclear whether there was sufficient evidence to charge conspiracy to a jury, and consequently whether the proffered statements would be admissible against Petitioner, see *Commonwealth v. Washington,* 449 Mass. 476, 869 N.E.2d 605, 615 (2007), the trial judge limited the prosecutor's opening to general references to these alleged meetings and directed him to avoid making specific reference to evidence that might ultimately be inadmissible.

Despite this admonition, in his opening statement the prosecutor referenced evidence connected to the Edwards conspiracy and indicated that Rowe had been killed because Petitioner mistakenly thought at first that Rowe had robbed him. Petitioner's attorney moved for a mistrial asserting that the prosecutor had gone beyond the limits set by the judge and impermissibly referenced specific statements by members of the Edwards conspiracy. The trial judge denied the motion, though he later entered a required finding of not guilty on the Edwards conspiracy charge and instructed the jury not to consider statements related to that conspiracy made during opening. Petitioner asserts that, in light of the trial judge's admonition to avoid referring to evidence that might ultimately be inadmissible, the prosecutor's reference to the content of specific

conversations related to the murder of Edwards constituted deliberate misconduct and deprived Petitioner of a fair trial.

The Supreme Court has made clear it that for this kind of due process challenge to succeed, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly,* 416 U.S. 637, 643, 94 S.Ct. 1868 (1974)). In making this determination, the First Circuit has stated that this court must weigh:

> (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case.

*Olszewski v. Spencer,* 466 F.3d 47, 59 (1st Cir.2006) (quoting *United States v. Lowe,* 145 F.3d 45, 50 (1st Cir.1998)).

▮▮▮ The SJC's analysis, which concluded that the prosecutor's opening statement did not require a mistrial in Petitioner's case, fits comfortably within this framework.[13] First, the SJC concluded that the prosecutor's opening remarks were not the result of bad faith. The fact that the challenged statements were ultimately inadmissible does not itself establish misconduct. Massachusetts law gives a trial judge discretion to admit evidence of a criminal enterprise subject to a motion to strike if the prosecution is later unable to show that the defendant was a part of the enterprise. *Commonwealth v. Colon–Cruz,* 408 Mass. 533, 562 N.E.2d 797, 806 (1990) ("The judge need not make a preliminary finding that a joint criminal enterprise exists as a precondition to admitting the evidence."). Insofar as the prosecutor may have overstepped the trial judge's pretrial limiting instruction, the SJC concluded that "in the context of the entire argument and in light of the judge's instructions to the jury," any error was not prejudicial. *Morgan,* 868 N.E.2d at 115. In short, the SJC found the remarks at issue were "[un]likely to leave an indelible imprint in the juror's minds." *Id.* at 114 (quoting *Commonwealth v. Fazio,* 375 Mass. 451, 378 N.E.2d 648, 651 (1978)).

Additionally, the trial judge's instructions to the jury before the openings, immediately after the openings, prior to closings, and in his final instructions mitigated any unfair prejudice that might otherwise have resulted from the prosecution's opening statement. *See, Dagley v. Russo,* 540 F.3d 8, 18 (1st Cir.2008) (finding prosecutor's error was mitigated, "albeit indirectly", through proper jury instructions). Furthermore, the prosecutor's statements relating to the conspiracy did not go to the core of the Commonwealth's case, but simply supported the prosecution's theory about Petitioner's motive for killing the victim. As the court noted, more than sufficient evidence of Petitioner's motive existed without reference to the conspiracy. *See Moreno–Morales v. United States,* 334 F.3d 140, 149 (1st Cir.2003). The SJC's ruling neither unreasonably applied

---

13. The SJC analyzed Petitioner's claim of prosecutorial error under the standard from *Commonwealth v. Thomas,* 429 Mass. 146, 706 N.E.2d 669, 677 (1999), which considers, "whether the prosecutor committed prejudicial error, how much any such error infected the trial, and whether it was possible to correct that error through instruction to the jury." For all relevant purposes, this standard is the functional equivalent to the federal standard for assessing such claims. *See Dagley v. Russo,* 540 F.3d 8, 15, n. 3 (1st Cir. 2008) (finding equivalence where a state court considers all of the factors explicitly considered by its federal counterpart).

nor was contrary to clearly established federal law.

### D. *Right of Confrontation.*

Petitioner's fourth and final claim is that the trial judge violated his Sixth Amendment right to confrontation by preventing his trial attorney from fully exploring the immigration history of prosecution witness Richard McLean on cross-examination. The SJC's decision did not directly address this question, instead limiting its inquiry to whether Petitioner was entitled to a new trial based on newly discovered evidence that McLean had been facing immigration-related sanctions at the time he testified. Respondent attributes the SJC's limited analysis to a failure by Petitioner to fairly present his claim to the SJC as required by 28 U.S.C. § 2254(b)(1)(A). Petitioner asserts he expressly presented his Confrontation Clause claim to the SJC within the context of his request for a new trial and that the SJC's failure to adjudicate the question entitles him to de *novo* review by this court.

### 1. *Exhaustion.*

Petitioners must fully exhaust their state remedies before applying for *habeas* relief in federal court. *Adelson v. DiPaola,* 131 F.3d 259, 261 (1st Cir.1997). "In order to exhaust a claim, the petitioner must present the federal claim fairly and recognizably to the state courts, . . . in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." *Clements v. Maloney,* 485 F.3d 158, 162 (1st Cir.2007) (internal citation and quotation marks omitted). In the First Circuit, a *habeas* petitioner may be fairly said to have presented his claim when he has "1) cited a specific constitutional provision, 2) relied on federal constitutional precedent, . . . 3) claimed a determinate right that is

constitutionally protected" or 4) presented the federal claim in a way that alerted the state court to its federal nature. *Nadworny v. Fair,* 872 F.2d 1093, 1097 (1st Cir. 1989).

Here, a review of Petitioner's previous state court submissions to the SJC convinces this court that Petitioner fairly presented his Sixth Amendment claim. Petitioner's motion for a new trial, as well as his appeal to the SJC, explicitly asserted that "the right of a criminal defendant to cross-examine a witness to show bias is well established by common law, *the Sixth Amendment to the United States Constitution,* and Article 12 of the Massachusetts Declaration of Rights." (Dkt. No. 9, Ex. 5, Mem. of Law in Supp. of Def.'s Mot. for a New Trial, Mass. Sup. Jud. Ct. and Mass. Super. Ct. Dkt. Nos. SJC–08813 and HDCR 1999–02596, February 17, 2004, at 61.)(emphasis added). In support of that proposition, Petitioner cited both federal as well as state precedent, including the United States Supreme Court's decision in *Davis v. Alaska* which he has relied upon in this *habeas* petition. These state court submissions were sufficient to alert a reasonable jurist to the existence and the character of his federal claim. Because it was never addressed by the state courts, this court will review Petitioner's Sixth Amendment claim *de novo. Pina v. Maloney,* 565 F.3d 48, 54 (1st Cir.2009); *Fortini v. Murphy,* 257 F.3d 39, 47 (2001) ("[a court] can hardly defer to the state court on an issue that the state court did not address.").

### 2. *The Merits of Petitioner's Claim.*

The substance of Petitioner's claim is that by limiting the scope of his cross-examination of Richard McLean, the trial court impermissibly deprived him of his right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution. *See Delaware v.*

*Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Petitioner argues that McLean's prior deportations, and his consequent vulnerability to criminal prosecution for illegal reentry, *see* 8 U.S.C. § 1326, were relevant to potential bias because they would have given McLean reason to curry favor with the prosecution.

In *Van Arsdall,* the Supreme Court recognized that "[a] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . ." *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431. The right to cross-examine, however, is not without limits, and "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [its scope]." *Id.* at 679. (noting that cross-examination may be limited in order to prevent, among other things, "harassment, prejudice, confusion of the issues, . . . or [repetitive or irrelevant] interrogation").

■■■■ In applying *Van Arsdall* to a specific instance in which the court has placed limits on cross-examination, "[t]he first question to be asked . . . is whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a 'significantly different impression' of the witness's credibility?" *DiBenedetto v. Hall,* 272 F.3d 1, 10 (1st Cir. 2001), (quoting *Van Arsdall,* 475 U.S. at 679–680, 106 S.Ct. 1431); *Knight v. Spencer,* 447 F.3d 6, 13 (1st Cir.2006). "The

second element of the Van Arsdall test is whether the error was harmless beyond a reasonable doubt."[14] *DiBenedetto,* 272 F.3d at 10. Applying these precepts to the record as a whole, this court concludes that the trial court's limit did not deprive Petitioner of his right to confront McLean.

Petitioner was stopped from inquiring into McLean's deportation history when the trial judge sustained a nonspecific government objection. (Dkt. No. 13, Trial Tr. vol. XI, 75: 16–19.("Trial Tr.")) Defense counsel was permitted to ask McLean whether he had a pending immigration detainer, which McLean testified he did not. At sidebar, defense counsel made an offer of proof. Noting McLean's criminal history and his lack of United States citizenship, she argued that the very severe penalties attaching for illegal *re*-entry made McLean's *prior* deportations uniquely relevant to his motivation to testify. For its part, the government argued that the entire deportation inquiry was irrelevant and merely an "attack on [McLean's] character." (Trial Tr. vol. XI, 81–2.) The trial judge eventually sustained the government's objection at the conclusion of a second sidebar discussion on the issue. (Trial Tr. vol. XI, 141–2.)

The record does not reflect the precise justification for limiting the inquiry sought by Petitioner, either at the time of the objection or during two subsequent sidebar discussions. *See* (Trial Tr. Vol. XI, 141). Given defense counsel's explanation of the relevance of McLean's prior deportations to a colorable theory of bias, this area of inquiry would ordinarily be fair game. *See Davis,* 415 U.S. at 316, 94 S.Ct. 1105 ("The partiality of a witness is subject

---

**14.** When assessing whether a particular limitation was constitutionally harmless, a court considers a number of factors, "including the importance of the testimony foreclosed, whether it was cumulative, the extent of

cross-examination otherwise permitted, and . . . 'the overall strength of the prosecution's case.'" *Farley v. Bissonnette,* 544 F.3d 344, 348 (1st Cir.2008) (quoting *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431).

to exploration at trial, and is always relevant when discrediting the witness and affecting the weight of his testimony."); *Commonwealth v. Bui*, 419 Mass. 392, 645 N.E.2d 689, 694 (1995) (where "there is a possibility of bias, even a remote one" a trial judge must allow some inquiry into the subject); *Commonwealth v. Omonira*, 59 Mass.App.Ct. 200, 794 N.E.2d 1248, 1252 (2003).

It is unnecessary, however, to linger on the issue of the trial judge's justification for his ruling because in the circumstances of this case, Petitioner retained sufficient leeway to impeach McLean's bias and veracity even absent inquiry into the subject of McLean's prior deportations. During a cross-examination spanning ninety pages of the trial transcript, Petitioner's attorney was allowed to explore: (1) McLean's use of a multitude of different names, false passports and false social security numbers (Trial Tr. vol. XI, 71–75, 143–144); (2) his prior convictions and pending criminal charges in California (Trial Tr. vol. XI, 137–138, 147); (3) repeated false statements given by McLean to Massachusetts State Police (Trial Tr. vol. XI, 95–97, 107–109, 130–134, 164); (4) McLean's history of drug dealing (Trial Tr. vol. XI, 82); and (5) McLean's citizenship, country of origin and the possibility of an immigration detainer against him (Trial Tr. vol. XI, 75–76, 141). This thorough cross-examination adequately illustrated to the jury both McLean's veracity and his potential for bias, and sufficiently enabled the jury to assess his credibility such that it would not have received a "significantly different impression" of McLean had the excluded question been allowed. *DiBenedetto v. Hall*, 272 F.3d 1, 10 (1st Cir.2001).

Petitioner argues it would be unreasonable to conclude that the permitted cross-examination was sufficient to provide the jury with a reasonably complete picture of McLean's motivations because other evidence of bias, namely McLean's pending charges in California, "fell flat" when presented to the jury. (Dkt. No. 3, Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus 65.) This argument—that exploring McLean's prior deportations was a *sine qua non* to satisfying of Petitioner's Sixth Amendment rights—is unpersuasive. The Confrontation Clause guarantees a criminal defendant "an *opportunity* for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985))(emphasis in original). Here, Petitioner's ability (albeit somewhat limited) to explore McLean's potential biases, coupled with the unfettered latitude to impeach McLean's veracity in manifold ways, afforded him the opportunity to effectively cross-examine McLean.

## V. CONCLUSION

Petitioner's extraordinarily powerful memorandum and vigorous arguments have given the court much food for thought and required a longer time for consideration, and a lengthier memorandum, than is usual for a *habeas* petition.

Nevertheless, for the reasons set forth above, the court must conclude that Petitioner is not entitled to relief. His petition is therefore hereby DISMISSED, and the clerk is ordered to enter judgment for Respondent. This case may now be closed.

It is So Ordered.